UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

CITY OF ST. CLAIR SHORES POLICE AND :   Civil Action No.   1:22-cv-05011
FIRE RETIREMENT SYSTEM, Individually  :
and on Behalf of All Others Similarly Situated, :   <u>CLASS ACTION</u>
                                               :
                    Plaintiff,   :   COMPLAINT FOR VIOLATIONS OF THE
                                               :   FEDERAL SECURITIES LAWS
              vs.   :
                                               :
UNILEVER PLC, ALAN JOPE, RITVA   :
SOTAMAA, NILS ANDERSEN, YOUNGME   :
MOON, GRAEME PITKETHLY, LAURA   :
CHA, JUDITH HARTMANN, ANDREA   :
JUNG, SUSAN KILSBY, STRIVE   :
MASIYIWA, JOHN RISHTON, and FEIKE   :
SIJBESMA,   :
                                             :
                    Defendants.   :
—————————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff City of St. Clair Shores Police and Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Unilever PLC ("Unilever" or the "Company"), Company press releases, conference call transcripts, and media reports about the Company.  Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Unilever American Depositary Receipts ("ADRs") between September 2, 2020 and July 21, 2021, inclusive (the "Class Period"), against Unilever and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.  The Company's ADRs, each representative of one share of Unilever common stock, are listed and trade under the ticker symbol "UL" on the New York

---

[1]      Emphasis has been added unless stated otherwise.

Stock Exchange ("NYSE"), a national stock market based in this District.  The depositary bank for Unilever's sponsored ADRs is Deutsche Bank Trust Company Americas ("Deutsche Bank"). Deutsche Bank is incorporated as a bank with limited liability in the State of New York and has its principal office, where it administers its depositary receipts business, in New York City.  The ADRs and the deposit agreement, which governs the relationship among Unilever, Deutsche Bank, and the holders and beneficial owners of the ADRs, are governed by New York law.

4.      In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff City of St. Clair Shores Police and Fire Retirement System, as set forth in the accompanying certification, which is incorporated by reference herein, purchased and acquired Unilever ADRs during the Class Period and was damaged thereby.

6.      Defendant Unilever is one of the world's largest consumer goods companies. Unilever is incorporated in England and has its principal executive offices in London.

7.      Defendant Alan Jope ("Jope") served as Chief Executive Officer ("CEO") and a Director of Unilever throughout the Class Period.

8.      Defendant Ritva Sotamaa ("Sotamaa") served as Chief Legal Officer and Group Secretary throughout the Class Period.

9.      Defendant Nils Andersen ("Andersen") served as Chairman and a Director of Unilever throughout the Class Period.

10.     Defendant Youngme Moon ("Moon") served as a Director of Unilever throughout the Class Period.

11.     Defendant Graeme Pitkethly ("Pitkethly") served as Chief Financial Officer ("CFO") and a Director of Unilever throughout the Class Period.

12.     Defendant Laura Cha ("Cha") served as a Director of Unilever throughout the Class Period.

13.     Defendant Judith Hartmann ("Hartmann") served as a Director of Unilever throughout the Class Period.

14.     Defendant Andrea Jung ("Jung") served as a Director of Unilever throughout the Class Period.

15.     Defendant Susan Kilsby ("Kilsby") served as a Director of Unilever throughout the Class Period.

16.     Defendant Strive Masiyiwa ("Masiyiwa") served as a Director of Unilever throughout the Class Period.

17.     Defendant John Rishton ("Rishton") served as a Director of Unilever throughout the Class Period.

18.     Defendant Feike Sijbesma ("Sijbesma") served as a Director of Unilever throughout the Class Period.

19.     Defendants Jope, Anderson, Moon, Pitkethly, Cha, Hartmann, Jung, Kilsby, Masiyiwa, Rishton, and Sijbesma are collectively referred to herein as the "Director Defendants." The Director Defendants and defendant Sotamaa are collectively referred to herein as the "Individual Defendants."  Unilever and the Individual Defendants are collectively referred to herein as "defendants."

20.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary

information concerning the Company and its business, operations, services, competition, sales, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is

responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

**The Company**

23.     Unilever was founded in 1929 when a Dutch margarine company, Margarine Unie, merged with a British soap company, Lever Brothers.  Today, Unilever is a British multinational consumer goods company with product divisions for foods and refreshments, home care, and beauty and personal care.  The Company sells more than 400 products in over 190 countries, including well-known brands such as Hellmann's mayonnaise, Vaseline, Dove soap, Lipton's teas, and Ben & Jerry's ice cream.

**Unilever's Acquisition of Ben & Jerry's**

24.     Ben & Jerry's ice cream, known for whimsical flavors such as Cherry Garcia and Chunky Monkey, is one of Unilever's marquee brands.  Ben & Jerry's was founded in 1978 by Ben Cohen and Jerry Greenfield with a $5 correspondence course in ice cream making and a $12,000 investment they used to open their first ice cream scoop shop in a dilapidated former gas station in Burlington, Vermont.

25.     Ben & Jerry's was founded on and dedicated to a three-part mission: (1) "Product Mission" – to make fantastic ice cream; (2) "Economic Mission" – to manage the company for sustainable financial growth; and (3) "Social Mission" – to use the company in innovative ways to make the world a better place.

26.     From its humble beginnings, Ben & Jerry's experienced tremendous growth; and in 2000 Ben & Jerry's namesakes sold their company to Unilever for $326 million.  In an attempt to preserve the company's "Social Mission," Unilever's acquisition had some unusual features.  Ben & Jerry's was allowed to operate separately from Unilever's existing U.S. ice cream business.  Ben &

Jerry's was even granted an independent board of directors which was given primary responsibility for preserving and enhancing the objectives of the company's Social Mission (the "B&J Board"). Additionally, Unilever committed $1.1 million a year to charitable causes, made a $5 million one-time grant to the Ben & Jerry's Foundation, and promised to continue Ben & Jerry's practice of devoting 7.5% of Ben & Jerry's pretax profits to a charitable foundation.

**In July 2020, Ben & Jerry's Independent Board**
**Passes a Resolution to Boycott Israel**

27.     More than 20 years after the acquisition, Ben & Jerry's remains a wholly owned subsidiary of Unilever with an independent board addressing the company's Social Mission.  Since the acquisition, the B&J Board continued its Social Mission by engaging in promotions and advocacy across a host of issues concerning the environment, voter turnout, fair trade, and genetically modified organisms.  Today, the B&J Board consists primarily of social activists who joined long after Unilever's acquisition.  Its chair is Anuradha Mittal ("Mittal"), the founder and executive director of the Oakland Institute, a self-described "independent policy think tank."

28.     Most recently, and as relevant to this action, the B&J Board passed a resolution in July 2020 to end sales of Ben & Jerry's products in areas that the B&J Board considers to be Palestinian territories illegally occupied by Israel.

29.     According to Mittal, Ben & Jerry's CEO Matthew McCarthy ("McCarthy") chose not to "operationalize" the resolution immediately, thus temporarily thwarting the B&J Board's decision. Notably, in 2018 Unilever appointed McCarthy as Ben & Jerry's CEO and as Unilever's representative on the B&J Board.

30.     Approximately a year later, on July 19, 2021, Ben & Jerry's finally announced on its website and through its Twitter account that, upon the expiration of the current licensing agreement

by which Ben & Jerry's products have been distributed in Israel for decades, Ben & Jerry's would

end sales of its ice cream in "Occupied Palestinian Territory" but would continue to sell in Israel:

> *We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT)*.  We also hear and recognize the concerns shared with us by our fans and trusted partners.
>
> We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region.  We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year.
>
> Although Ben & Jerry's will no longer be sold in the OPT, *we will stay in Israel through a different arrangement*.  We will share an update on this as soon as we're ready.

31.     Unilever followed up with its own similar statement, echoing in relevant part that Ben

& Jerry's would continue to sell its products in Israel:

> We remain fully committed to our presence in Israel, where we have invested in our people, brands and business for several decades.  Ben & Jerry's was acquired by Unilever in 2000.  As part of the acquisition agreement, we have always recognized the right of the brand and its independent Board to take decisions about its social mission.  *We also welcome the fact that Ben & Jerry's will stay in Israel*.

32.     In a separate statement reported by *NBC News*, however, the B&J Board disputed that

Ben & Jerry's would remain in Israel and that Unilever had any authority to make such a promise:

> *The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory (the OPT) does not reflect the position of the independent board, nor was it approved by the independent board*.  By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement.

33.     According to Mittal, the B&J Board had been pushing to withdraw for years.

Furthermore, the board wanted to release a different statement, reviewed by NBC News, that made

no reference to continued sales in Israel – a decision that Mittal said would require board approval.

Referring to the Unilever announcement, Mittal said, "I am saddened by the *deceit* of it."

**The Boycott, Divestment, and Sanctions Movement**
**and Anti-BDS Legislation**

34.     The decision by the B&J Board appears to arise out of the boycott, divestment, and sanctions ("BDS") movement.  The BDS movement is a pro-Palestinian movement promoting boycotts, divestments, and economic sanctions against Israel.  The BDS movement's objective is to coerce Israel into making concessions to the Palestinians by using boycotts and the like to exert economic and political pressure.  The BDS movement is controversial.  For example, the U.S. House of Representatives passed a resolution condemning the BDS movement on July 24, 2019 by a vote of 398-17.

35.     Additionally, and of particular significance here, 35 U.S. states have adopted laws, executive orders, or resolutions aimed at discouraging boycotts, divestment, and sanctions of Israel ("Anti-BDS Legislation").  The consequences for a company violating Anti-BDS Legislation range from the company being barred from contracting with the state to having the state divest its investments in the boycotting company, thereby driving down the price of the company's stock and, in the case of the company's bonds, driving up the company's borrowing costs.

36.     Unilever thus had ample reason to conceal the B&J Board resolution and thereafter to mischaracterize it once Unilever's hand-selected CEO finally "operationalized" it.  Indeed, it is difficult to understand how Ben & Jerry's would remain in Israel "through a different arrangement." First, Israeli law prohibits businesses from discriminating against Israeli citizens based on where they live.  Second, Unilever and Ben & Jerry's were required to sell Ben & Jerry's products in Israel and all its areas pursuant to the terms under which the Israeli Competition Authority approved Unilever's merger with Ben & Jerry's.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

37.     The Class Period begins on September 2, 2020 when Unilever filed with the SEC a

Form 6-K (the "September 2, 2020 Form 6-K") signed by defendant Sotamaa.  The September 2,

2020 Form 6-K announced the Company's "2020 First Half Year Results."  Included within the

filing was a brief description of the Company's "Principal Risk Factors."  This description in turn

cited to the Company's 2019 Annual Report and Accounts on Form 20-F ("2019 Form 20-F") and its

more-detailed assessment of the principal risk issues that Unilever faced, as broken down under the

following headings: brand preference; portfolio management; climate change; plastic packaging;

***customer***; talent; supply chain; safe and high quality products; systems and information; business

transformation;  economic  and  political  instability;  treasury  and  tax;  ***ethical; and legal and***

***regulatory***.  In the September 2, 2020 Form 6-K, the Company made no changes to the 2019 Form

20-F's risk disclosures other than to discuss how COVID-19 impacted the previously disclosed risk

factors.

38.     In the 2019 Form 20-F, which was filed with the SEC on March 9, 2020 and signed

by defendant Sotamaa, Unilever described its "Customer" risks in relevant part as follows:

> ***Successful customer relationships are vital to our business and continued
> growth***.
>
> ***Maintaining strong relationships with our <u>existing</u> customers*** and building
> relationships with new customers who have built new technology-enabled business
> models to serve changing shopper habits ***are necessary to ensure our brands are
> well presented to our consumers and <u>available for purchase at all times</u>***.
>
> . . . Failure to maintain strong relationships with customers could negatively
> impact our terms of business with affected customers and reduce the availability of
> our products to consumers.
>
> ***Risk change since last year: Increase***

39.     In the 2019 Form 20-F, Unilever described its "Ethical" risks in relevant part as follows:

> *Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally*.
>
> *Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands*.
>
> A key element of our ethical approach to business is to reduce inequality and promote fairness.  Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well.  The safety of our employees and the people and communities we work with is critical.  *Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results*.
>
> *Risk change since last year: No change*

40.     In the 2019 Form 20-F, Unilever described its "Legal" risks in relevant part as follows:

> *Compliance with laws and regulations is an essential part of Unilever's business operations.*
>
> *Unilever is subject to national and regional laws and regulations* in such diverse areas as product safety, product claims, trademarks, copyright, patents, competition, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.
>
> *Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation*. Changes to laws and regulations could have a material impact on the cost of doing business.
>
> *Risk change since last year: No change*

41.     The September 2, 2020 Form 6-K was materially false and misleading when made because Unilever's discussion of its Principal Risk Factors and its Customer, Ethical, and Legal risks (via Unilever's citation to its 2019 Form 20-F) omitted discussing: (a) that, in July 2020, the B&J Board passed a resolution to end sales of its ice cream in "Occupied Palestinian Territory"; and (b)

the risks attendant to the B&J Board's decision.  Specifically, the Company's description of its Customer risks in ¶38 was materially false and misleading because Unilever acknowledged the importance of maintaining successful customer relationships with existing customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash.  Additionally, the Company's description of its Ethical risks in ¶39 was materially false and misleading because Unilever acknowledged that its brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results.  Lastly, the Company's description of its Legal risks in ¶40 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of Anti-BDS Legislation.

42.    On October 22, 2020, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day titled "Unilever Trading Statement Third Quarter 2020" (the "October 22, 2020 Form 6-K").  The October 22, 2020 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

43.    The "Cautionary Statement" section of the October 22, 2020 Form 6-K stated in relevant part as follows:

> *Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences*; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects;

economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . . *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with* the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2019* and the Unilever Annual Report and Accounts 2019.

44.     Thus, Unilever's October 22, 2020 Form 6-K cited the same risk disclosures contained in Unilever's 2019 Form 20-F as those listed in ¶¶38-40, which were materially false and misleading for the reasons stated in ¶41.

45.     On February 4, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day announcing Unilever's "2020 Full Year Results" (the "February 4, 2021 Form 6-K"). The February 4, 2021 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

46.     The "Cautionary Statement" section of the February 4, 2021 Form 6-K stated in relevant part as follows:

> *Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences*; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects; economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . . *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings* with the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2019* and the Unilever Annual Report and Accounts 2019.

47.     Thus, Unilever's February 4, 2021 Form 6-K cited the same risk disclosures contained in Unilever's 2019 Form 20-F as those listed in ¶¶38-40, which were materially false and misleading for the reasons stated in ¶41.

48.     On March 10, 2021, Unilever filed a Form 20-F Annual Report ("2020 Form 20-F"), signed by defendant Sotamaa.  As relevant here, included within Unilever's 2020 Form 20-F was Unilever's "Strategic Report," located on pages 1 through 60, which had been approved by the Director Defendants.

49.     The Strategic Report section of the 2020 Form 20-F contained a discussion of the Company's "Principal risk factors."  The discussion provided in relevant part as follows:

> ***Our business is subject to risks and uncertainties.  On the following pages we have identified the risks that we regard as the most relevant to our business. These are the risks that we see as most material to Unilever's business and performance at this time****.  There may be other risks that could emerge in the **future***.  Our principal risks include risks that could impact our business in the short-term (i.e. the next two years), medium term (i.e. the next three to ten years) or over the long term (i.e. beyond ten years).
>
> ***Our principal risks have not changed this year****.

50.     The Strategic Report section of the 2020 Form 20-F described Unilever's "Customer" risks in relevant part as follows:

> ***Successful customer relationships are vital to our business and continued growth****.
>
> ***Maintaining strong relationships with our <u>existing</u> customers*** and building relationships with new customers who have built new technology-enabled business models to serve changing shopper habits ***are necessary to ensure our brands are well presented to our consumers and <u>available for purchase at all times</u>****.
>
> The strength of our customer relationships also affects our ability to obtain pricing and competitive trade terms.  ***Failure to maintain strong relationships with customers could negatively impact our terms of business with affected customers and reduce the availability of our products to consumers***.

- 13 -

51.     The Strategic Report section of the 2020 Form 20-F described Unilever's "Ethical" risks in relevant part as follows:

> ***Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally.  Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands***.
>
> A key element of our ethical approach to business is to reduce inequality and promote fairness.  Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well.  The safety of our employees and the people and communities we work with is critical.  ***Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results***.

52.     The Strategic Report section of the 2020 Annual Report described Unilever's "Legal" risks in relevant part as follows:

> ***Compliance with laws and regulations is an essential part of Unilever's business operations***.
>
> ***Unilever is subject to national and regional laws and regulations*** in such diverse areas as product safety, product claims, trademarks, copyright, patents, ***competition***, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.
>
> ***Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation***. Changes to laws and regulations could have a material impact on the cost of doing business.

53.     The Strategic Report section of the 2020 Form 20-F was materially false and misleading when made because Unilever's discussion of its Principal Risk Factors and its Customer, Ethical, and Legal risks omitted discussing: (a) that, in July 2020, the B&J Board passed a resolution to end sales of its ice cream in "Occupied Palestinian Territory"; and (b) the risks attendant to the B&J Board's decision.  Specifically, the Company's description of its Customer risks in ¶50 was materially false and misleading because Unilever acknowledged the importance of maintaining

successful customer relationships with existing customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash.   Additionally, the Company's description of its Ethical risks in ¶51 was materially false and misleading because Unilever acknowledged that its brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results.   Lastly, the Company's description of its Legal risks in ¶52 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of Anti-BDS Legislation.

54.     Also on March 10, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day concerning Unilever's "2020 Annual Financial Report Announcement" (the "March 10, 2021 Form 6-K").   The March 10, 2021 Form 6-K was signed by defendant Sotamaa.

55.     The March 10, 2021 Form 6-K included a discussion of the Company's "Principal Risk Factors," which provided in relevant part as follows:

> *These are the risks that we see as most material to Unilever's business and performance at this time*.   There may be other risks that could emerge in the future.
>
> If the circumstances in these risks occur our cash flow, operating results, financial position, business and reputation could be materially adversely affected.   In addition, risks and uncertainties could cause actual results to vary from those described, which may include forward-looking statements, or could impact on our ability to meet our targets or be detrimental to our profitability or reputation.

56.     The March 10, 2021 Form 6-K described Unilever's "Customer" risks in relevant part as follows:

> *Successful customer relationships are vital to our business and continued growth*.

*Maintaining strong relationships with our **existing** customers** and building **relationships** with new customers who have built new technology enabled business models to serve changing shopper habits are necessary to ensure our brands are well presented to our consumers and **available for purchase at all times**.*

The strength of our customer relationships also affects our ability to obtain pricing and competitive trade terms. ***Failure to maintain strong relationships with customers could negatively impact our terms of business with affected customers and reduce the availability of our products to consumers***.

The Covid-19 pandemic has driven a rapid increase in online shopping which means we need to accelerate development of eCommerce capabilities.

***Risk change since last year: Increase***

57.    The March 10, 2021 Form 6-K described Unilever's "Ethical" risks in relevant part as

follows:

***Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally***.

***Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands***.

A key element of our ethical approach to business is to reduce inequality and promote fairness. Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well. The safety of our employees and the people and communities we work with is critical. ***Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results***.

***Risk change since last year: No change***.

58.    The March 10, 2021 Form 6-K described Unilever's "Legal" risks in relevant part as

follows:

***Compliance with laws and regulations is an essential part of Unilever's business operations***.

***Unilever is subject to national and regional laws and regulations*** in such diverse areas as product safety, product claims, trademarks, copyright, patents, competition, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.

> *Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation.* Changes to laws and regulations could have a material impact on the cost of doing business.

> *Risk change since last year: No change*

59.    The March 10, 2021 Form 6-K was materially false and misleading when made because Unilever's discussion of its Principal Risk Factors and its Customer, Ethical, and Legal risks omitted discussing: (a) that, in July 2020, the B&J Board passed a resolution to end sales of its ice cream in "Occupied Palestinian Territory"; and (b) the risks attendant to the B&J Board's decision. Specifically, the Company's description of its Customer risks in ¶56 was materially false and misleading because Unilever acknowledged the importance of maintaining successful customer relationships with existing customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash. Additionally, the Company's description of its Ethical risks in ¶57 was materially false and misleading because Unilever acknowledged that its brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results. Lastly, the Company's description of its Legal risks in ¶58 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of Anti-BDS Legislation.

60.    On April 29, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day titled "1st Quarter 2021 Trading Statement" (the "April 29, 2021 Form 6-K"). The April 29, 2021 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

61.     The "Cautionary Statement" section of the April 29, 2021 Form 6-K stated in relevant part as follows:

> *Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences*; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects; economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . .
>
>     *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with* the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2020* and the Unilever Annual Report and Accounts 2020 available on our corporate website.

62.     Thus, Unilever's April 29, 2021 Form 6-K cited the same risk disclosures contained in Unilever's 2020 Form 20-F as those listed in ¶¶49-52, which were materially false and misleading for the reasons stated in ¶53.

63.     During the morning of July 19, 2021, Unilever and its hand-picked CEO McCarthy finally "operationalized" the B&J Board's resolution to boycott Israel. Ben & Jerry's announced on its website and through its Twitter account that, upon the expiration of the current licensing agreement by which its products had been distributed in Israel for decades, Ben & Jerry's would end sales of its ice cream in "Occupied Palestinian Territory" but Ben & Jerry's would purportedly continue to sell its products in Israel.

64.     In response to this news, the price of Unilever ADRs closed down $0.58 per ADR that day (approximately 1%).

65.     After the move, Israeli Prime Minister Naftali Bennett characterized the action as a "blatantly anti-Israel step" and informed Unilever CEO Jope that Ben & Jerry's decision would have "serious repercussions, legal and otherwise."

66.     The repercussions came swiftly.  During the morning of July 22, 2021, CNBC reported that the states of Texas and Florida were examining Ben & Jerry's actions in connection with the states' Anti-BDS Legislation.  In addition to condemnation of Ben & Jerry's boycott by Texas Governor Greg Abbott, CNBC reported that Texas State Comptroller Glenn Hegar ("Hegar"), who controls billions of dollars in assets for Texas' public pension funds, had already told his office to take action.  In a statement to CNBC, Hegar said, "I've directed my staff to determine whether any specific action has been taken by Ben & Jerry's or Unilever would trigger a listing under Chapter 808 of the Texas Government Code," the Anti-BDS Legislation passed by Texas in 2017. Similarly, the state of Florida's CFO Jimmy Patronis, who controls Florida's public pension funds, told CNBC that his office was already discussing the issue.  In a letter reportedly sent to Ben & Jerry's CEO, Patronis wrote: "It is my belief that Ben & Jerry's brazen refusal to do business in Israel will result in your placement on the Scrutinized Companies that Boycott Israel List."  The letter also stated that Florida would then "be prohibited from investing in Ben & Jerry's or its parent company, Unilever."  Being added to the list also meant that Unilever would not be able to enter or renew contracts with the state or any municipality in Florida.

67.     In response to this news, the price of Unilever ADRs closed down $3.19 per ADR that day, approximately 5.4%.

68.     Ultimately, the states of New York, New Jersey, Florida, Texas, Illinois, Colorado, and Arizona announced decisions to divest their pension fund investments in Unilever due to violations of their Anti-BDS Legislation.

69.     As a result of defendants' wrongful acts and omissions, and the declines in the market value of Unilever ADRs, plaintiff and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

70.     Because Ben & Jerry's is a wholly owned subsidiary of Unilever, Unilever had the right to obtain meeting minutes and resolutions of the B&J Board at all times throughout the Class Period.  In addition, Unilever was aware of and had access to B&J Board resolutions through Ben & Jerry's CEO and B&J Board member McCarthy, whom Unilever appointed in 2018.

71.     Furthermore, the B&J Board's Chair (Mittal) stated that the board had been pushing to release a statement pledging to withdraw Ben & Jerry's products for months, but that senior Unilever executives became heavily involved due to the decision's political sensitivity.

72.     Indeed, Unilever's efforts to conceal Ben & Jerry's boycott decision by delaying its announcement and then mischaracterizing the decision when it was announced, *see* ¶¶29-33, further demonstrate defendants' scienter because it confirms that defendants were aware of the negative consequences a truthful announcement would have.

73.     Similarly, Unilever has yet to explain how Ben & Jerry's will continue to be sold in Israel "through a different arrangement" given that: (a) businesses in Israel are prevented from discriminating against Israeli citizens based on where they live; and (b) Unilever and Ben & Jerry's are required to sell Ben & Jerry's products in Israel and all its areas pursuant to the terms under which the Israeli Competition Authority originally approved Unilever's merger with Ben & Jerry's. Unilever's continued silence on this issue further corroborates that Unilever's statements were simply a ruse to conceal the risks created by Ben & Jerry's boycott decision.

## NO SAFE HARBOR

74.     The "Safe Harbor" warnings accompanying Unilever's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles ("GAAP"), including those filed with the SEC on Form 6-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

75.     Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and approved by an executive officer of Unilever who knew the FLS was false.  None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made; nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

76.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

77.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Unilever ADRs was an efficient market at all relevant times by virtue of the following factors, among others: (a) Unilever ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market; (b) Unilever regularly communicated with public

investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (c) Unilever was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

78.     As a result of the foregoing, the market for Unilever ADRs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all those who transacted in Unilever ADRs during the Class Period suffered similar injury through their transactions in Unilever ADRs at artificially inflated prices, and a presumption of reliance applies.

79.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Unilever ADRs between the time defendants misrepresented and failed to disclose material facts and the time the facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Unilever ADRs and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

**LOSS CAUSATION/ECONOMIC LOSS**

80.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Unilever ADRs by misrepresenting the value of the Company's business and prospects by concealing the resolution by the B&J Board as well as the risks attendant thereto.  As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of

the Company's ADRs fell precipitously as the prior artificial inflation came out of the ADRs' price. As a result of their purchases of Unilever ADRs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

81.     The market for Unilever ADRs was open, well developed, and efficient at all relevant times.  Throughout the Class Period, Unilever ADRs traded at artificially inflated prices as a direct result of defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiff and other members of the Class (defined below) purchased or otherwise acquired Unilever ADRs, relying upon the integrity of the market price for Unilever ADRs and market information relating to Unilever, and they have been damaged thereby.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of Unilever ADRs during the Class Period.  Excluded from the Class are defendants and members of their immediate families; the officers and directors of the Company at all relevant times and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Unilever ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Unilever or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 23 -

84.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (a) whether the Exchange Act was violated by defendants as alleged herein; (b) whether statements made by defendants misrepresented material facts about the business, operations, and management of Unilever; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

88.     Plaintiff incorporates all of the preceding paragraphs by reference.

89.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Unilever ADRs during the Class Period.

91.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Unilever ADRs.  Plaintiff and the Class would not have purchased Unilever ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

92.     Plaintiff incorporates all of the preceding paragraphs by reference.

93.     The Individual Defendants acted as controlling persons of Unilever within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Unilever to engage in the wrongful conduct complained of herein.  Unilever controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.      Awarding such equitable and injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 15, 2022                              ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                   SAMUEL H. RUDMAN


                                                   *s/ Samuel H. Rudman*
                                                   SAMUEL H. RUDMAN

                                                   58 South Service Road, Suite 200
                                                   Melville, NY  11747
                                                   Telephone:  631/367-7100
                                                   631/367-1173 (fax)
                                                   srudman@rgrdlaw.com

- 26 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
rgonnello@rgrdlaw.com

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
<u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

City of St. Clair Shores Police and Fire Retirement System ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of St. Clair Shores Police and Fire Retirement System v. Credit Suisse Group AG,* No. 1:21-cv-03385 (S.D.N.Y.)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this  13  day of June, 2022.

City of St. Clair Shores Police and Fire
Retirement System

By:  _____
James Haddad, Chairman

UNILEVER

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**ADR**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 11/30/2020[A] | 1,351 | $61.06 |
| 11/30/2020[A] | 1,556 | $61.06 |
| 01/15/2021 | 821 | $59.62 |
| 01/29/2021 | 974 | $58.30 |
| 02/18/2021 | 725 | $55.18 |
| 03/03/2021 | 388 | $53.57 |
| 03/16/2021 | 297 | $56.06 |
| 03/17/2021 | 586 | $55.92 |
| 04/20/2021 | 694 | $57.58 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 12/08/2020 | 1,351 | $58.50 |

Prices listed are rounded up to two decimal places.

[A]Shares that were received in.