UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CITY OF ST. CLAIR SHORES POLICE AND :     Civil Action No. 1:22-cv-05011-LGS
FIRE RETIREMENT SYSTEM, Individually   :
and on Behalf of All Others Similarly Situated, :
                                 :     CLASS ACTION
                Plaintiff,       :
                                   :     AMENDED COMPLAINT FOR
       vs.                          :     VIOLATIONS OF THE FEDERAL
                                   :     SECURITIES LAWS
UNILEVER PLC, ALAN JOPE, RITVA       :
SOTAMAA, and GRAEME PITKETHLY,    :
                                   :
             Defendants.     :
                                   :     DEMAND FOR JURY TRIAL

———————————————————— x

Lead Plaintiff Westchester Teamsters Pension Fund and Teamsters Local 456 Annuity Fund (the "Teamsters Funds") and Plaintiff City of St. Clair Shores Police and Fire Retirement System (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based on the investigation undertaken by counsel, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings by Unilever PLC ("Unilever" or the "Company"), Company press releases, conference call transcripts, analyst reports, and media reports about the Company. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Unilever American Depositary Receipts ("ADRs") between September 2, 2020 and July 21, 2021, inclusive (the "Class Period"), against Unilever and certain of its officers and directors for violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Unilever is one of the world's largest consumer products companies, selling over 400 brands in over 190 countries. The Company is based in London, England, and its ADRs trade on the New York Stock Exchange ("NYSE").

3.     In 2000, Unilever acquired U.S. ice cream maker Ben & Jerry's Homemade, Inc. ("Ben & Jerry's"). Ben & Jerry's was well-known at the time and remains well-known to this day for its luscious ice creams and its commitment to various social causes. Because Ben & Jerry's

---

[1]    Emphasis has been added unless stated otherwise.

founders wanted to preserve their company's commitment to social causes, Unilever's acquisition of Ben & Jerry's contained a number of unusual features. The most relevant of these features is that the acquisition was structured so that post-merger Ben & Jerry's would retain an independent board of directors that was given primary responsibility for preserving and enhancing the objectives of the company's social mission (the "B&J Board").

4.      In July 2020, the B&J Board decided to end sales of Ben & Jerry's ice cream in the portions of Israel that the B&J Board considered to be Palestinian territories that are illegally occupied by Israel. This decision precipitated a year-long dispute between Unilever and Ben & Jerry's over whether and how to implement the B&J Board's decision.

5.      This case arises from the defendants' misrepresentations and omissions concerning the risks and uncertainties Unilever faced as a result of the B&J Board's decision and the resulting intercorporate dispute. Throughout the Class Period, the defendants made numerous representations regarding the customer, ethical, and legal risks that Unilever faced. All of these statements failed to disclose Ben & Jerry's decision to boycott Israel and the disagreement between Unilever and Ben & Jerry's over that decision. The omission of this information concealed the nature and magnitude of the actual risks and uncertainties Unilever faced.

6.      At the time these statements were made, the defendants knew of Ben & Jerry's decision and its adverse implications, hence the reason for the dispute. Ben & Jerry's is a wholly-owned subsidiary of Unilever. As such, the defendants had access to the resolution that memorialized the B&J Board's July 2020 decision. Moreover, Unilever had selected and appointed Matthew McCarthy ("McCarthy") as Ben & Jerry's Chief Executive Officer and a member of the B&J Board. McCarthy represented Unilever's interests and reported back to the Company. In fact,

McCarthy stalled the implementation of the B&J Board's decision for approximately a year until the Chair of the B&J Board informed Unilever that the B&J Board was going public with its decision.

7.       Given the controversial nature of the geopolitical issues involved, Ben & Jerry's status as one of Unilever's marquee brands and most successful acquisitions, and the web of state laws prohibiting most U.S. states from doing business with or investing in companies that boycott Israel, it is no wonder why Unilever tried to hide Ben & Jerry's decision and their dispute for as long as Unilever could.

8.       On July 19, 2021, Ben & Jerry's finally announced through its Twitter account and on its website that, upon expiration of the current licensing agreement, Ben & Jerry's would end sales of its ice cream in "Occupied Palestinian Territory" but would continue to sell its products in Israel. Unilever made a related statement acknowledging Ben & Jerry's decision but "welcom[ing] the fact that Ben & Jerry's will stay in Israel."  However, after the market closed that day, NBC News reported that the B&J Board had not authorized the Ben & Jerry's statement referencing continued sales in Israel.  NBC News additionally reported that the B&J Board had passed the resolution authorizing its decision in July 2020 but that Ben & Jerry's CEO, a Unilever appointee, "never operationalized it."

9.       On July 20, 2021, Israeli Prime Minister Naftali Bennett ("Bennett") characterized the decision as a "clearly anti-Israel step," adding that the move would have "serious consequences, legal and otherwise."  Two days later, CNBC reported that the States of Texas and Florida were examining Ben & Jerry's actions in connection with their respective state laws prohibiting boycotts of Israel, violations of which could result in governmental entities being prohibited from investing in and doing business with Ben & Jerry's and Unilever.

10.    As the truth emerged about the B&J Board's boycott decision and the dispute between the B&J Board and Unilever, the price of Unilever ADRs markedly and predictably declined, damaging Plaintiffs and other members of the Class.  This action seeks redress for the damages that the defendants' misrepresentations and omissions caused when the truth became known.

## JURISDICTION AND VENUE

11.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

12.    Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.  The Company's ADRs, each representative of one share of Unilever common stock, are listed and trade under the ticker symbol "UL" on the NYSE, a national stock market based in this District.  The depositary bank for Unilever's sponsored ADRs is Deutsche Bank Trust Company Americas ("Deutsche Bank").  Deutsche Bank is incorporated as a bank with limited liability in the State of New York and has its principal office, where it administers its depositary receipts business, in New York City.  The ADRs and the deposit agreement, which governs the relationship among Unilever, Deutsche Bank, and the holders and beneficial owners of the ADRs, are governed by New York law.

13.    In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Lead Plaintiff Teamster Funds purchased and acquired Unilever ADRs during the Class Period and were damaged thereby, as set forth in the certifications previously filed with the Court (ECF No. 15-2), which are incorporated by reference herein.

15.     Plaintiff City of St. Clair Shores Police and Fire Retirement System purchased and acquired Unilever ADRs during the Class Period and was damaged thereby, as set forth in the certification previously filed with the Court (ECF No. 1), which is incorporated by reference herein.

16.     Defendant Unilever is one of the world's largest consumer goods companies. Unilever is incorporated in England and its principal executive offices are in London.

17.     Defendant Alan Jope ("Jope") is Unilever's Chief Executive Officer and a member of its Board of Directors.  Jope also served in those roles throughout the Class Period.

18.     Defendant Ritva Sotamaa ("Sotamaa") served as Unilever's Chief Legal Officer and Group Secretary from January 2018 through March 2022.

19.     Defendant Graeme Pitkethly ("Pitkethly") is Unilever's Chief Financial Officer and a member of Unilever's Board of Directors.  Pitkethly also served in those roles throughout the Class Period.

20.     Defendants Jope, Pitkethly, and Sotamaa are collectively referred to herein as the "Individual Defendants."  Unilever and the Individual Defendants are collectively referred to herein as "Defendants."

21.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business operations, services, competition, sales, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and

information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

# BACKGROUND

## The Company

24.     Unilever was founded in 1929 when a Dutch margarine company, Margarine Unie, merged with a British soap company, Lever Brothers.  Today, Unilever is a British multinational consumer goods company with five distinct business groups: (1) Beauty & Wellbeing; (2) Personal Care; (3) Home Care; (4) Nutrition; and (5) Ice Cream.  The Company sells more than 400 brands of products in over 190 countries, including well-known brands such as Hellmann's mayonnaise, Vaseline, Dove soap, Seventh Generation cleaning products, and Ben & Jerry's ice cream.

## Unilever's Acquisition of Ben & Jerry's

25.     Ben & Jerry's was founded in 1978 by Ben Cohen and Jerry Greenfield after they took a $5 correspondence course on ice cream making and invested $12,000 to open their first scoop shop in a dilapidated former gas station in Burlington, Vermont.

26.     The two self-proclaimed "hippies" wanted their business to be about more than just ice cream so they adopted a corporate model based on a concept of "linked prosperity."  "Linked prosperity" reflected the notion that, as Ben & Jerry's prospered, the stakeholders connected to the business would prosper too.

27.     As part of the model, Ben & Jerry's formally adopted a three-part mission: (1) to make fantastic ice cream (the "Product Mission"); (2) to manage the company for sustainable financial growth (the "Economic Mission"); and (3) to use the company in innovative ways to make the world a better place (the "Social Mission").  Each mission was to be of equal importance.

28.     From its humble beginnings, Ben & Jerry's experienced tremendous growth and ultimately became a publicly traded company.  In 2000, Ben & Jerry's namesakes decided it was time to cash out, selling their business to Unilever for $326 million.

29.     In an attempt to preserve Ben & Jerry's "Social Mission," Unilever's acquisition had some unusual features.  Ben & Jerry's was allowed to operate separately from Unilever's existing U.S. ice cream business.  As relevant here, Ben & Jerry's was even granted an independent board of directors which was given primary responsibility for preserving and enhancing the objectives of the company's Social Mission.  Additionally, Unilever committed $1.1 million a year to charitable causes, made a $5 million one-time grant to the Ben & Jerry's Foundation, and promised to continue Ben & Jerry's practice of devoting 7.5% of Ben & Jerry's pretax profits to a charitable foundation.

30.     According to Richard Goldstein, Unilever's Chief Executive Officer of North America at the time of Unilever's acquisition, "The only reason we were successful in the acquisition is because Ben and Jerry became convinced that Unilever would honor its word.  There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."[2]

31.     Over twenty years later, Ben & Jerry's is one of Unilever's marquee brands, known for whimsical flavors such as Cherry Garcia and Chunky Monkey.  It is one of only thirteen Unilever brands with annual sales of over one billion euros;[3] and in the United States it is the top-ranked brand by sales, with over $935 million in sales during the 52-week period ended September 5, 2021.[4]

**A Dispute Arises Between Unilever and B&J's Board Over the Decision to Boycott Israel**

32.     Ben & Jerry's is currently a wholly owned subsidiary of Conopco, Inc. ("Conopco") (d/b/a Unilever), a New York corporation that is headquartered in Englewood Cliffs, New Jersey.  Conopco is an indirect, wholly owned subsidiary of Unilever and is Ben & Jerry's sole shareholder.

---

[2]     *Brad Edmondson, Ice Cream Social: The Struggle for the Soul of Ben & Jerry's* (2014) at 159.

[3]     *Ben & Jerry's says Unilever froze directors' salaries over Israel*, REUTERS (Aug. 3, 2022), https://www.cnn.com/2022/08/03/business-food/ben-and-jerry-israel-unilever/index.html.

[4]     Statista.com, https://www.statista.com/statistics/755237/unit-sales-ice-cream-brands/.

33.    Ben & Jerry's still maintains an independent board overseeing the company's Social Mission.  Since Unilever's acquisition, the B&J Board has advanced Ben & Jerry's Social Mission by engaging in promotions and advocacy across a wide range of issues concerning the environment, voter turnout, fair trade, and genetically modified organisms *inter alia*.  At present, the B&J Board consists primarily of social activists who joined long after Unilever's acquisition.  The B&J Board's Chair is Anuradha Mittal ("Mittal"), the founder and executive director of the Oakland Institute, a self-described "independent policy think tank."

34.    In recent years, one of the issues the B&J Board considered was whether Ben & Jerry's should continue selling ice cream in Israel.  As explained by Matt Close ("Close"), Unilever's Business Group President of Ice Cream, when Conopco acquired Ben & Jerry's in 2000, Ben & Jerry's had an existing license relationship dating back to 1987 with its Israeli distributor Avi Zinger ("Zinger") and his affiliated companies including American Quality Products Ltd ("AQP") (the "AQP License Agreement").[5]  The AQP License Agreement provided AQP with the exclusive right to manufacture and distribute Ben & Jerry's ice cream throughout the State of Israel and the "occupied territories" under Israeli control (the "Territories").  *Id.*  The AQP License Agreement was renewed and amended over the years, with the operative agreement during the Class Period set to expire December 31, 2022.[6]

---

[5]    *See Ben & Jerry's Homemade, Inc. v. Conopco, Inc. et al.*, Case No. 1:22-cv-05681 (ALC) (S.D.N.Y.) (the "Conopco Action"), ECF No. 31 ¶6, Declaration of Matt Close in Support of Defendant Conopco, Inc.'s Opposition to Plaintiff's Application for Preliminary Injunctive Relief ¶6 filed on July 11, 2022 ("Close Declaration").  The Close Declaration was filed by Conopco in post-Class Period litigation Ben & Jerry's filed against Conopco and Unilever.  This litigation is described more fully in ¶¶98-101 *infra*.

[6]    *See Avi Avraham Zinger et al. v. Ben & Jerry's Homemade, Inc. et al.*, Case No.: 2-22-cv-01154-KM-JBC (D.N.J.) (the "Zinger Action"), ECF No. 4-2 ¶¶37, 49, Declaration of Avi Zinger in Support of Motion for Preliminary Injunctive Relief filed on March 11, 2022 ("Zinger Declaration"). The Zinger Declaration was filed by Zinger and AQP in their post-Class Period litigation against

35.    Starting around 2014, certain outside organizations began calling upon Ben & Jerry's to stop selling its ice cream in Israel.  *See* Conopco Action, Close Declaration ¶9; Zinger Action, Zinger Declaration ¶¶33-34.  Since then, the B&J Board organized multiple trips to the region and appointed a special committee to review the issue.  *See* Conopco Action, Close Declaration ¶9; Conopco Action, ECF No. 58 ¶¶67-68, Amended Complaint, filed on September 30, 2022.

36.    Meanwhile, on more than one occasion between 2018 through 2021, Zinger informed the B&J Board that it would be a violation of both Israel's anti-discrimination law and Israel's anti-boycott laws for AQP to cease distribution of Ben & Jerry's products in the Territories.  Zinger Action, Zinger Declaration ¶44.  Zinger further explained that violating these laws could subject AQP to fines and criminal prosecution as well as the loss of numerous governmental benefits.  *Id*. ¶45.

37.    In February 2020, Zinger wrote to Ben & Jerry's CEO McCarthy and B&J Board Chair Mittal, asking Ben & Jerry's to extend the AQP License Agreement beyond 2022 so that AQP could make long-term investments needed to address increased competition and other economic circumstances.  *See id.* ¶¶46-47.

38.    McCarthy promptly responded in an email (copying Mittal), indicating that he agreed to an extension: "After your amazing performance in 2019 I know 2020 will be tougher.  Thank you for initiative [sic] discussion on contract – I look forward to extending it."  *Id*. ¶50.

---

Ben & Jerry's, Conopco, and Unilever United States, Inc.  The litigation is described more fully in ¶¶96-97 *infra*.

39.    In July 2020, however, the B&J Board decided against renewal, instead passing a resolution to end sales of Ben & Jerry's products in areas that the B&J Board considered to be Palestinian territories that are illegally occupied by Israel.[7]  Conopco Action, Close Declaration ¶10.

40.    According to Mittal, Ben & Jerry's CEO McCarthy—a Unilever appointee—chose not to "operationalize" the resolution immediately, thus temporarily thwarting the B&J Board's decision.[8]

41.    According to Close, for the year following the B&J Board's resolution, Unilever, McCarthy, and the B&J Board continued to "debate **whether** and how to implement the Board's desired changes."  Conopco Action, Close Declaration ¶11.  "Unilever's goal was to ***find an outcome that mitigated the risks to Unilever*** while also respecting the Board's new position regarding business in Israel and the Territories."  *Id*. ¶12.  In other words, Unilever disagreed with the B&J Board's decision but chose to delay implementation for as long as possible.

42.    Approximately a year later, after Mittal informed Unilever that the B&J Board intended to announce its decision publicly, Unilever relented.  *See id.* ¶13.  On July 19, 2021, Ben & Jerry's announced on its website and through its Twitter account that, upon the expiration of the current licensing agreement by which Ben & Jerry's products have been distributed in Israel for decades, Ben & Jerry's would end sales of its ice cream in "Occupied Palestinian Territory" but would continue to sell in Israel:

> ***We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT)***.  We also hear and recognize the concerns shared with us by our fans and trusted partners.

---

[7]    *See* Olivia Solon, *Ben & Jerry's withdraws sales from Israeli settlements but clashes with parent company Unilever*, NBC NEWS (July 19, 2021) ("NBC News Report"), https://www.nbcnews.com/business/business-news/ben-jerry-s-withdraws-sales-israeli-settlements-clashes-parent-company-n1274403.

[8]    *Id.*

We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year.

*    *    *

Although Ben & Jerry's will no longer be sold in the OPT, *we will stay in Israel through a different arrangement*. We will share an update on this as soon as we're ready.

43.    Unilever followed up with its own similar statement, echoing in pertinent part that Ben & Jerry's would continue to sell its products in Israel:

We remain fully committed to our presence in Israel, where we have invested in our people, brands and business for several decades. Ben & Jerry's was acquired by Unilever in 2000. As part of the acquisition agreement, we have always recognized the right of the brand and its independent Board to take decisions about its social mission. *We also welcome the fact that Ben & Jerry's will stay in Israel*.

44.    In a separate statement reported by *NBC News* on July 19, 2021, however, the B&J Board disputed that Ben & Jerry's would remain in Israel and that Unilever had any authority to make such a promise:

*The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory (the OPT) does not reflect the position of the independent board, nor was it approved by the independent board*. By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, **Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement**.[9]

45.    According to Mittal, the B&J Board had been pushing to withdraw for years. *Id.* Furthermore, the B&J Board wanted to release a different statement, reviewed by NBC News, that made no reference to continued sales in Israel – a decision that Mittal said would require B&J Board

---

[9]    Olivia Solon, *Ben & Jerry's withdraws sales from Israeli settlements but clashes with parent company Unilever*, NBC NEWS (July 19, 2021) ("NBC News Report"), https://www.nbcnews.com/business/business-news/ben-jerry-s-withdraws-sales-israeli-settlements-clashes-parent-company-n1274403.

approval. *Id.* Referring to the Unilever announcement, Mittal said, "I am saddened by the ***deceit*** of it." *Id.*

**The Boycott, Divestment, and Sanctions Movement**
**and Anti-BDS Legislation**

46.     The decision by the B&J Board appears to arise out of the boycott, divestment, and sanctions ("BDS") movement.  The BDS movement is a pro-Palestinian movement promoting boycotts, divestments, and economic sanctions against Israel.  The BDS movement's objective is to coerce Israel into making concessions to the Palestinians by using boycotts and the like to exert economic and political pressure.  The BDS movement is controversial.  For example, the U.S. House of Representatives passed a resolution condemning the BDS movement on July 24, 2019 by a vote of 398-17.

47.     Additionally, and of particular significance here, 35 U.S. states have adopted laws, executive orders, or resolutions aimed at discouraging boycotts, divestment, and sanctions of Israel ("Anti-BDS Legislation").[10] The consequences for a company violating Anti-BDS Legislation range from the company being barred from contracting with the state to having the state divest its investments in the boycotting company, thereby driving down the price of the company's stock and, in the case of the company's bonds, driving up the company's borrowing costs.[11]

48.     Unilever thus had ample reason to conceal the B&J Board resolution and thereafter to mischaracterize it once Unilever's hand-selected CEO finally "operationalized" it.

---

[10]   The states include Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin, and West Virginia.  *See* https://www.jewishvirtuallibrary.org/anti-bds-legislation.

[11]   *See*   Jewish   Virtual   Library,   *Anti-Semitism:   State   Anti-BDS   Legislation,* https://www.jewishvirtuallibrary.org/anti-bds-legislation.

49.    For that matter, it is difficult to understand how Ben & Jerry's was to remain in Israel "through a different arrangement."  First, Israel's nondiscrimination laws prohibits businesses from discrimination in the furnishing of a product or public service on the basis of many categories including race, religion, nationality, place of origin, gender, sexual orientation, age and ***residence***. Zinger Action, Zinger Declaration ¶35; Prohibition of Discrimination in Products, Services and Entry into Places of Entertainment and Public Places Law, 5761-2000.

50.    Second, Israel's anti-boycott law prohibits any person from knowingly calling for a boycott against the State of Israel or any area under its control.  Zinger Action, Zinger Declaration ¶36; Anti-Boycott Law, 5771-2011.

51.    Third, Unilever and Ben & Jerry's were required to sell Ben & Jerry's products in Israel and all its areas pursuant to the terms under which the Israeli Competition Authority ("ICA") approved Unilever's merger with Ben & Jerry's.  *See* Zinger Action, Zinger Declaration ¶¶12-15.[12] As stated in a press release by Dror Strum, the Israeli Antitrust Commissioner at the time the ICA approved Unilever's merger, Ben & Jerry's boycott violates the terms pursuant to which the merger was approved:

> Ben & Jerry's announcement is a blunt violation of the terms included in the controversial merger approval decision of 2001 between Unilever Global and Ben & Jerry's.  Violation of these merger decision terms is considered a grave violation of Israel Competition Law and hold the same status as a legal decree.
>
> Dror Strum was the Head of the Competition Authority and the Antitrust Commissioner that approved the merger 20 years ago.
>
> In his letter to Michal Halperin, the current head of the Israeli Competition Authority, Strum explained that acquisition of Ben & Jerry's Global by Unilever Global in 2001 raised significant difficulties in Israel.  Unilever already controlled a dominant domestic ice cream company (Strauss Ice Creams Ltd) and therefore a

---

[12]    ILH Staff, *Ben & Jerry's decision to restrict sales in Israel 'illegal,' says former antitrust chief*, ISRAEL HAYOM (July 23, 2021), https://www.israelhayom.com/2021/07/23/ben-jerrys-decision-to-restrict-sales-in-israel-illegal-says-former-antitrust-chief/.

merger with Ben & Jerry's would have strengthened Unilever's monopoly in the country.

Strum's letter said it was for that reason that the statutory decision to approve the merger included restrictive conditions under which Unilever was obligated to maintain a complete separation between Ben & Jerry's Global and Ben & Jerry's Israel licensee, and not to restrict or harm in any manner the independent licensee.

The terms specifically stated that "Unilever and Strauss Ice Cream and Ben & Jerry's agreement said they would not take any action that may interfere with the franchisee's activities in the country." Strum added, "**as long as Unilever wants to continue to sell ice cream in Israel, it must continue to sell Ben & Jerry's in Israel and in all its area**s.["] (emphasis in original).

Strum concluded his letter saying therefore it is prohibited to limit the license (through limiting sales of ice cream), let alone terminate the contract with the licensee in Israel without the Israeli Competition Authority's approval.

Strum said, the decision to reduce sales "is illegal, contrary to the conditions, and has devastating and immediate consequences for the licensee in Israel." Strum has sent a written notice to Ben & Jerry's Global, warning them they are violating the Israeli Competition Law and the terms of the merger.[13]

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

52. The Class Period begins on September 2, 2020 when Unilever filed with the SEC a Form 6-K (the "September 2, 2020 Form 6-K") signed by defendant Sotamaa and included a statement by defendant Jope. The September 2, 2020 Form 6-K announced the Company's "2020 First Half Year Results." Included within the filing was a brief description of the Company's "Principal Risk Factors." This description in turn cited to the Company's 2019 Annual Report and Accounts on Form 20-F filed with the SEC on March 9, 2020 for the fiscal year ended December 31, 2019 ("2019 Form 20-F") and its more-detailed assessment of the principal risk issues that Unilever

---

[13]  Dror Stru, *Former Israel Antitrust Commissioner to Israel's Competition Authority that approved controversial merger of Unilever and Ben & Jerry's in Israel says: "Unilever Global's Ben and Jerry's announcement to end sales is illegal,"* PRNEWSWIRE (July 23, 2021), https://www.prnewswire.com/il/news-releases/former-israel-antitrust-commissioner-to-israel-s-competition-authority-that-approved-controversial-merger-of-unilever-and-ben-amp-jerry-s-in-israel-says-unilever-global-s-ben-and-jerry-s-announcement-to-end-sales-is-illegal-831344122.html.

faced, as broken down under the following headings: brand preference; portfolio management; climate change; plastic packaging; *customer*; talent; supply chain; safe and high quality products; systems and information; business transformation; economic and political instability; treasury and tax; *ethical; and legal and regulatory*.  The September 2, 2020 Form 6-K *made no changes to the 2019 Form 20-F's risk disclosures* other than to discuss how COVID-19 impacted the previously disclosed risk factors.

53.    In the 2019 Form 20-F, which was filed with the SEC on March 9, 2020 and signed by defendant Sotamaa, the 2019 Form 20-F described Unilever's "Customer" risks in pertinent part as follows:

> *Successful customer relationships are vital to our business and continued growth*.
>
> *Maintaining strong relationships with our <u>existing</u> customers* and building relationships with new customers who have built new technology-enabled business models to serve changing shopper habits are *necessary to ensure our brands are well presented to our consumers and <u>available for purchase at all times</u>*.
>
> . . . *Failure to maintain strong relationships with customers could negatively impact our terms of business with affected customers and reduce the availability of our products to consumers*.
>
> *Risk change since last year: Increase*

54.    In the 2019 Form 20-F, Unilever described its "Ethical" risks in pertinent part as follows:

> *Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally*.
>
> *Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands*.
>
> A key element of our ethical approach to business is to reduce inequality and promote fairness.  Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well.  The safety of our

employees and the people and communities we work with is critical. *Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results*.

       *Risk change since last year: No change*

55.    In the 2019 Form 20-F, Unilever described its "Legal" risks in pertinent part as follows:

       *Compliance with laws and regulations is an essential part of Unilever's business operations*.

       *Unilever is subject to national and regional laws and regulations* in such diverse areas as product safety, product claims, trademarks, copyright, patents, competition, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.

       *Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation*. Changes to laws and regulations could have a material impact on the cost of doing business.

       *Risk change since last year: No change*

56.    The September 2, 2020 Form 6-K was materially false and misleading when made because its discussion of Unilever's Principal Risk Factors and Unilever's Customer, Ethical, and Legal risks (by citation to Unilever's 2019 Form 20-F) omitted discussing the following adverse facts pertaining to the Company's business operations, and prospects, which were known to defendants or recklessly disregarded by them: (a) that, in July 2020, the B&J Board passed a resolution to end sales of Ben & Jerry's ice cream in "Occupied Palestinian Territory"; (b) that, Unilever and the B&J Board disagreed over whether and how the B&J Board's resolution should be implemented; and (c) as a result of the foregoing, defendants' statements about the risks Unilever faced were materially misleading and lacked a reasonable basis. Specifically, the description of Unilever's Customer risks in ¶53 was materially false and misleading because Unilever acknowledged the importance of maintaining successful customer relationships with existing

customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash.  Additionally, the description of Unilever's Ethical risks in ¶54 was materially false and misleading because the description acknowledged that Unilever's brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing (a) Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results, and (b) the dispute between Unilever and Ben & Jerry's over whether and how to implement the B&J Board's decision, which risked damage to Unilever's reputation and ability to make future acquisitions.  Lastly, the description of Unilever's Legal risks in ¶55 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of U.S. Anti-BDS Legislation.

57.    On October 22, 2020, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day titled "Unilever Trading Statement Third Quarter 2020" (the "October 22, 2020 Form 6-K").  The October 22, 2020 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

58.    The "Cautionary Statement" section of the October 22, 2020 Form 6-K stated in pertinent part as follows:

> ***Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences***; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects;

economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . . *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with* the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2019* and the Unilever Annual Report and Accounts 2019.

59.     Thus, Unilever's October 22, 2020 Form 6-K cited the same risk disclosures contained in Unilever's 2019 Form 20-F as those listed in ¶¶53-55, which were materially false and misleading for the reasons stated in ¶56.

60.     On February 4, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day announcing Unilever's "2020 Full Year Results" (the "February 4, 2021 Form 6-K"). The February 4, 2021 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

61.     The "Cautionary Statement" section of the February 4, 2021 Form 6-K stated in pertinent part as follows:

> *Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting consumer preferences*; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects; economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . . *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with* the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2019 and the Unilever Annual Report and Accounts 2019*.

62.     Thus, Unilever's February 4, 2021 Form 6-K cited the same risk disclosures contained in Unilever's 2019 Form 20-F as those listed in ¶¶53-55, which were materially false and misleading for the reasons stated in ¶56.

63.     On March 10, 2021, Unilever filed a Form 20-F Annual Report ("2020 Form 20-F"), signed by defendant Sotamaa.  As relevant here, included within Unilever's 2020 Form 20-F was Unilever's "Strategic Report," located on pages 1 through 60, which had been approved by the Company's Board of Directors (which included defendants Jope and Pitkethly) and was signed on their behalf by defendant Sotamaa.

64.     The Strategic Report section of the 2020 Form 20-F contained a discussion of the Company's "Principal risk factors."  The discussion provided in pertinent part as follows:

> *Our business is subject to risks and uncertainties.  On the following pages we have identified the risks that we regard as the most relevant to our business.  These are the risks that we see as most material to Unilever's business and performance at this time*.  There may be other risks that could emerge in the future.  Our principal risks include risks that could impact our business in the short-term (*i.e.* the next two years), medium term (*i.e.* the next three to ten years) or over the long term (*i.e.* beyond ten years).
>
> *Our principal risks have not changed this year*.

65.     The Strategic Report section of the 2020 Form 20-F described Unilever's "Customer" risks in pertinent part as follows:

> *Successful customer relationships are vital to our business and continued growth*.
>
> *Maintaining strong relationships with our <u>existing</u> customers* and building relationships with new customers who have built new technology-enabled business models to serve changing shopper habits *are necessary to ensure our brands are well presented to our consumers and <u>available for purchase at all times</u>*.
>
> The strength of our customer relationships also affects our ability to obtain pricing and competitive trade terms.  *Failure to maintain strong relationships with customers could negatively impact our terms of business with affected customers and reduce the availability of our products to consumers*.

66. The Strategic Report section of the 2020 Form 20-F described Unilever's "Ethical" risks in pertinent part as follows:

> ***Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally.  Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands.***

> A key element of our ethical approach to business is to reduce inequality and promote fairness.  Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well.  The safety of our employees and the people and communities we work with is critical.  ***Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results.***

67. The Strategic Report section of the 2020 Annual Report described Unilever's "Legal" risks in pertinent part as follows:

> ***Compliance with laws and regulations is an essential part of Unilever's business operations.***

> ***Unilever is subject to national and regional laws and regulations*** in such diverse areas as product safety, product claims, trademarks, copyright, patents, ***competition***, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.

> ***Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation.*** Changes to laws and regulations could have a material impact on the cost of doing business.

68. The Strategic Report section of the 2020 Form 20-F was materially false and misleading when made because its discussion of Unilever's Principal Risk Factors and Unilever's Customer, Ethical, and Legal risks omitted discussing the following adverse facts pertaining to the Company's business operations and prospects, which were known to defendants or recklessly disregarded by them: (a) that, in July 2020, the B&J Board passed a resolution to end sales of Ben & Jerry's ice cream in "Occupied Palestinian Territory"; (b) that, Unilever and the B&J Board

disagreed over whether and how the B&J Board's resolution should be implemented; and (c) as a result of the foregoing, defendants' statements about the risks Unilever faced were materially misleading and lacked a reasonable basis. Specifically, the description of Unilever's Customer risks in ¶65 was materially false and misleading because Unilever acknowledged the importance of maintaining successful customer relationships with existing customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash. Additionally, the description of Unilever's Ethical risks in ¶66 was materially false and misleading because the description acknowledged that Unilever's brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing (a) Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results, and (b) the dispute between Unilever and Ben & Jerry's over whether and how to implement the B&J Board's decision, which risked damage to Unilever's reputation and ability to make future acquisitions. Lastly, the description of Unilever's Legal risks in ¶67 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of U.S. Anti-BDS Legislation.

69.     Additionally, the Form 20-F omitted material information it was required to contain. Item 5 of Part of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*" (Emphasis in original). Specifically, Item 5(D), entitled "Trend Information," provides (emphasis is added):

> The company should identify the most significant recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the

latest financial year. *The company also should discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.*

70.     The scope of the information whose disclosure is required under this paragraph on trends, uncertainties, and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires a registration to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

71.     In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating in pertinent part as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *       *       *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

72.     The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event, or uncertainty, on the assumption that it will come to fruition.  Disclosure is then

required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

73.      Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F."  The SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – *i.e.*, reasonably likely to have a material effect.  The specific standard governs the circumstances in which Item 303 requires disclosure.  The probability/magnitude test for materiality approved by the Supreme Court in *Basic v. Levinson*, 108 S.Ct. 978 (1988), is inapposite to Item 303 disclosure.

74.      Furthermore, in adopting the amendments in 2003 to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

75.      Accordingly, the 2020 Form 20-F violated Item 303 by failing to discuss the material adverse facts alleged in ¶¶32-45 above concerning (a) the B&J Board's decision to end sales of Ben & Jerry's ice cream in "Occupied Palestinian Territory"; and (b) the disagreement between Unilever and the B&J Board over whether and how the B&J Board's resolution should be implemented. These material adverse facts and events created known trends and uncertainties that were reasonably likely to have an adverse impact on the Company's financial condition and results of operations, and, accordingly, appropriate disclosure in the 2020 Form 20-F was required.

76.     Also on March 10, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day concerning Unilever's "2020 Annual Financial Report Announcement" (the "March 10, 2021 Form 6-K").  The March 10, 2021 Form 6-K was signed by defendant Sotamaa.

77.     The March 10, 2021 Form 6-K included a discussion of the Company's "Principal Risk Factors," which provided in pertinent part as follows:

> ***These are the risks that we see as most material to Unilever's business and performance at this time***.  There may be other risks that could emerge in the future.
>
> If the circumstances in these risks occur our cash flow, operating results, financial position, business and reputation could be materially adversely affected.  In addition, risks and uncertainties could cause actual results to vary from those described, which may include forward-looking statements, or could impact on our ability to meet our targets or be detrimental to our profitability or reputation.

78.     The March 10, 2021 Form 6-K described Unilever's "Customer" risks in pertinent part as follows:

> ***Successful customer relationships are vital to our business and continued growth***.
>
> ***Maintaining strong relationships with our <u>existing</u> customers*** and building relationships with new customers who have built new technology enabled business models to serve changing shopper habits are necessary to ensure our brands are well presented to our consumers and ***<u>available for purchase at all times</u>***.
>
> The strength of our customer relationships also affects our ability to obtain pricing and competitive trade terms.  ***Failure to maintain strong relationships with customers could negatively impact our terms of business with affected customers and reduce the availability of our products to consumers***.
>
> The Covid-19 pandemic has driven a rapid increase in online shopping which means we need to accelerate development of eCommerce capabilities.
>
> ***Risk change since last year: Increase***

79.     The March 10, 2021 Form 6-K described Unilever's "Ethical" risks in pertinent part as follows:

> *Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally.*

> *Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands.*

> A key element of our ethical approach to business is to reduce inequality and promote fairness.  Our activities touch the lives of millions of people and it is our responsibility to protect their rights and help them live well.  The safety of our employees and the people and communities we work with is critical.  *Failure to meet these high standards could result in damage to Unilever's corporate reputation and business results.*

> *Risk change since last year: No change.*

80.     The March 10, 2021 Form 6-K described Unilever's "Legal" risks in pertinent part as follows:

> *Compliance with laws and regulations is an essential part of Unilever's business operations.*

> *Unilever is subject to national and regional laws and regulations* in such diverse areas as product safety, product claims, trademarks, copyright, patents, competition, employee health and safety, data privacy, the environment, corporate governance, listing and disclosure, employment and taxes.

> *Failure to comply with laws and regulations could expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation.*  Changes to laws and regulations could have a material impact on the cost of doing business.

> *Risk change since last year: No change*

81.     The March 10, 2021 Form 6-K was materially false and misleading when made because its discussion of Unilever's Principal Risk Factors and Unilever's Customer, Ethical, and Legal risks omitted discussing the following adverse facts pertaining to the Company's business operations and prospects, which were known to defendants or recklessly disregarded by them: (a) that, in July 2020, the B&J Board passed a resolution to end sales of Ben & Jerry's ice cream in "Occupied Palestinian Territory"; (b) that, Unilever and the B&J Board disagreed over whether and

- 26 -

how the B&J Board's resolution should be implemented; and (c) as a result of the foregoing, defendants' statements about the risks Unilever faced were materially misleading and lacked a reasonable basis. Specifically, the description of Unilever's Customer risks in ¶78 was materially false and misleading because Unilever acknowledged the importance of maintaining successful customer relationships with existing customers but omitted discussing that the B&J Board had already decided to end sales to existing Israeli customers, which risked reduced sales and a customer backlash. Additionally, the description of Unilever's Ethical risks in ¶79 was materially false and misleading because the description acknowledged that Unilever's brands and reputation are valuable assets that could be impacted by unethical conduct but omitted discussing (a) Ben & Jerry's boycott decision, which risked damage to Unilever's brands, reputation, and business results, and (b) the dispute between Unilever and Ben & Jerry's over whether and how to implement the B&J Board's decision, which risked damage to Unilever's reputation and ability to make future acquisitions. Lastly, the description of Unilever's Legal risks in ¶80 was materially false and misleading because Unilever acknowledged that complying with all applicable laws and regulations was important but omitted discussing Ben & Jerry's boycott decision, which risked adverse governmental actions for violations of U.S. Anti-BDS Legislation.

82.    On April 29, 2021, Unilever filed a Form 6-K, which included as an exhibit a Notice to London Stock Exchange dated that day titled "1st Quarter 2021 Trading Statement" (the "April 29, 2021 Form 6-K"). The April 29, 2021 Form 6-K was signed by defendant Sotamaa and included quotes from defendant Jope.

83.    The "Cautionary Statement" section of the April 29, 2021 Form 6-K stated in pertinent part as follows:

> *Among other risks and uncertainties, the material or principal factors which could cause actual results to differ materially are: Unilever's global brands not meeting*

*consumer preferences*; Unilever's ability to innovate and remain competitive; Unilever's investment choices in its portfolio management; the effect of climate change on Unilever's business; Unilever's ability to find sustainable solutions to its plastic packaging; significant changes or deterioration in customer relationships; the recruitment and retention of talented employees; disruptions in our supply chain and distribution; increases or volatility in the cost of raw materials and commodities; the production of safe and high quality products; secure and reliable IT infrastructure; execution of acquisitions, divestitures and business transformation projects; economic, social and political risks and natural disasters; financial risks; failure to meet high and ethical standards; and managing regulatory, tax and legal matters. A number of these risks have increased as a result of the current Covid-19 pandemic. . . .

> *Further details of potential risks and uncertainties affecting the Group are described in the Group's filings with* the London Stock Exchange, Euronext Amsterdam and *the US Securities and Exchange Commission, including in the Annual Report on Form 20-F 2020* and the Unilever Annual Report and Accounts 2020 available on our corporate website.

84.    Thus, Unilever's April 29, 2021 Form 6-K cited the same risk disclosures contained in Unilever's 2020 Form 20-F as those listed in ¶¶64-67, which were materially false and misleading for the reasons stated in ¶68.

85.    During the morning of July 19, 2021, Unilever and its hand-picked CEO McCarthy finally "operationalized" the B&J Board's resolution to boycott Israel.

86.    On July 19, 2021, after the market had opened, Ben & Jerry's tweeted "Ben & Jerry's will end sales of our ice cream in the Occupied Palestinian Territory. Read our full statement: [with this link to our website]." Ben & Jerry's explained on its website that, upon the expiration of its current license agreement with its Israeli manufacturer and distributor, Ben & Jerry's would no longer be sold in the "Occupied Palestinian Territory," but that it would "stay in Israel through a different arrangement." *See supra* ¶42.

87.    After the market closed that day, NBC reported more details concerning Ben & Jerry's decision and its dispute with Unilever about whether and how to implement the B&J Board's decision. *See supra* ¶¶44-45.

88.     In response to this news, the price of Unilever ADRs closed down $0.58 per ADR on July 19, 2021 (approximately 1%) and down $0.75 per ADR on July 20, 2021 (approximately 1.3%), respectively.

89.     Shortly after Ben & Jerry's announcement, Israeli Prime Minister Naftali Bennett ("Bennett") characterized the action as a "blatantly anti-Israel step" and informed Unilever CEO Jope that Ben & Jerry's decision would have "serious repercussions, legal and otherwise."

90.     The repercussions came swiftly.  During the morning of July 22, 2021, CNBC reported that the states of Texas and Florida were examining Ben & Jerry's actions in connection with the states' Anti-BDS Legislation.  In addition to condemnation of Ben & Jerry's boycott by Texas Governor Greg Abbott, CNBC reported that Texas State Comptroller Glenn Hegar ("Hegar"), who controls billions of dollars in assets for Texas' public pension funds, had already told his office to take action.  In a statement to CNBC, Hegar said, "I've directed my staff to determine whether any specific action has been taken by Ben & Jerry's or Unilever would trigger a listing under Chapter 808 of the Texas Government Code," the Anti-BDS Legislation passed by Texas in 2017. Similarly, the state of Florida's CFO Jimmy Patronis, who controls Florida's public pension funds, told CNBC that his office was already discussing the issue.  In a letter reportedly sent to Ben & Jerry's CEO, Patronis wrote: "It is my belief that Ben & Jerry's brazen refusal to do business in Israel will result in your placement on the Scrutinized Companies that Boycott Israel List."  The letter also stated that Florida would then "be prohibited from investing in Ben & Jerry's or its parent company, Unilever."  Being added to the list also meant that Unilever would not be able to enter or renew contracts with the state or any municipality in Florida.

91.     In response to this news, the price of Unilever ADRs closed down $3.19 per ADR that day, approximately 5.4%.

92.    As a result of Defendants' wrongful acts and omissions, and the declines in the market price of Unilever ADRs, Plaintiffs and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

## RELEVANT POST-CLASS PERIOD EVENTS

93.    In Israel, Ben & Jerry's boycott was met with widespread condemnation.  Prime minister Bennett said that Ben & Jerry's has decided to brand itself as an "anti-Israel ice cream."[14] His predecessor, Benjamin Netanyahu, tweeted, "Now we Israelis know which ice cream NOT to buy."[15]  Israeli cabinet minister  Orna Barbivay posted a TikTok video of her throwing a pint in the trash.[16]  And 90 members of Israel's Knesset from across the political spectrum sent a letter to defendant Jope protesting Ben & Jerry's decision and urging Unilever to reverse Ben & Jerry's "shameful" decision.[17]

94.    Outside of Israel, some grocery store chains, such as Morton Williams[18] and Gristedes,[19] reduced shelf space and advertising for Ben & Jerry's products, while other chains like the El Rosado Group (which owns over 180 stores in Ecuador) pulled **all Unilever** ice cream.[20]

---

[14]    JTA Staff, *How the Jewish world is responding to Ben & Jerry's decision to exit Israeli settlements*, JEWISH TELEGRAPHIC AGENCY (July 19, 2021), https://www.jta.org/2021/ 07/19/israel/the-ice-cold-fallout-to-ben-jerrys-ending-distribution-in-israeli-settlements.

[15]    *Id.*

[16]    *Id.*

[17]    Amy Spiro, *90 members of Knesset urge Unilever to reverse 'shameful' Ben & Jerry's decision*, THE TIMES OF ISRAEL (July 28, 2021), https://www.timesofisrael.com/90-members-of-knesset-urge-unilever-to-reverse-shameful-ben-jerrys-decision/

[18]    Lisa Fickenscher, *Morton Williams cracks down on Ben & Jerry's over Israel controversy*, NEW YORK POST (July 19, 2021), https://nypost.com/2021/07/19/morton-williams-cracks-down-on-ben-jerrys-over-israel-controversy/; *Some Grocery Stores Pulling Ben & Jerry's Off Shelves After Brand Announces Plans To Stop Selling Ice Cream In Occupied Palestinian Territories*, CBS NEWS (July 23, 2021), https://www.cbsnews.com/newyork/news/ben-and-jerrys-israel-palestine-new-york-grocery-stores/.

95.    On the regulatory front, the states of New York,[21] New Jersey,[22] Florida,[23] Texas,[24] Illinois,[25] Colorado,[26] and Arizona[27] announced decisions to divest their state's pension fund investments in Unilever due to violations of each state's respective Anti-BDS Legislation.

96.    Litigation also ensued.  On March 3, 2022, Zinger and AQP filed a lawsuit against Ben & Jerry's, Conopco, and Unilever United States, Inc. in the United States District Court for the

---

[19]   Shira Hanau, *Angry over settlement boycott, NYC grocery chain to limit Ben & Jerry's sales*, THE TIMES OF ISRAEL (July 26, 2021), https://www.timesofisrael.com/angry-over-settlement-boycott-nyc-grocery-chain-to-limit-ben-jerrys-sales/.

[20]   Jim Cornall, *Ben & Jerry's Israel boycott row intensifies*, DAIRY REPORTER (July 26, 2021), https://www.dairyreporter.com/Article/2021/07/26/Ben-Jerry-s-Israel-boycott-row-intensifies.

[21]   Ross Kerber, *New York pension fund joins exit from Unilever over Israel restrictions*, REUTERS (Oct. 28, 2021), https://www.reuters.com/business/new-york-pension-fund-divest-104-mln-stake-unilever-2021-10-29/#:~:text=Oct%2028%20(Reuters)%20%2D%20New,the%20Israeli%2Doccupied% 20Palestinian%20territories.

[22]   *Treasury Statement on Pension Fund Investments in Ben & Jerry's Parent Company Unilever*, NEW     JERSEY     DEPARTMENT     OF     THE     TREASURY     (Sept.     14,     2021), https://www.nj.gov/treasury/news/2021/09152021.shtml.

[23]   *Florida Places Ben & Jerry's Parent Company Unilever on Its List of Scrutinized Companies that Boycott Israel*, FLORIDA GOVERNOR (Aug. 3, 2021), https://www.flgov.com/2021/08/03/florida-places-ben-jerrys-parent-company-unilever-on-its-list-of-scrutinized-companies-that-boycott-israel/.

[24]   *Texas Comptroller Glenn Hegar: Ben & Jerry's and its Parent Company Added to Texas List of Companies    That    Boycott    Israel*,    COMPTROLLER    TEXAS    (Sept.    23,    2021), https://comptroller.texas.gov/about/media-center/news/20210923-texas-comptroller-glenn-hegar-ben-and-jerrys-and-its-parent-company-added-to-list-of-companies-that-boycott-israel-1632327961380.

[25]   Jacob Magid, *Illinois divests pension funds from Unilever over Ben & Jerry's settlement boycott*, THE TIMES OF ISRAEL (Dec. 23, 2021), https://www.timesofisrael.com/illinois-divests-pension-funds-from-unilever-over-ben-jerrys-settlement-boycott/

[26]   *Colorado PERA votes to assess Unilever investment over Ben and Jerry's statement*, COLORADO PERA (Mar. 18, 2022), https://www.copera.org/files/8ab44fe1e/PressRelease_Unilever+Ben+ and+Jerrys_3.18.22.pdf.

[27]   *Arizona Treasurer Kimberly Yee Divests State Funds from Ben & Jerry's for Boycotting Israel*, OFFICE     OF     THE     ARIZONA     STATE     TREASURER     (Sept.     7,     2021), https://www.aztreasury.gov/_files/ugd/8bb536_e2cfd32637a64f96bbaf8b5a9c2a4ecd.pdf.

District of New Jersey, in an action captioned *Avi Avraham Zinger et al. v. Ben & Jerry's Homemade, Inc. et al.*, Case No.: 2-22-cv-01154-KM-JBC (D.N.J.).  AQP and Zinger asserted claims for breach of contract, wrongful termination, breach of the implied covenant of good faith and fair dealing, and false light invasion of privacy in connection with the B&J Board's decision.

97.    On June 28, 2022, Unilever changed course and announced on its website that the Company had settled with Zinger and AQP, stating in pertinent part:

> Unilever today announced it has reached a new arrangement for Ben & Jerry's in Israel which will ensure the ice cream stays available to all consumers.

> The company has sold its Ben & Jerry's business interests in Israel to Avi Zinger, the owner of American Quality Products Ltd (AQP), the current Israel-based licensee. The new arrangement means Ben & Jerry's will be sold under its Hebrew and Arabic names throughout Israel and the West Bank under the full ownership of its current licensee.

> Under the terms of Unilever's acquisition agreement of Ben & Jerry's in 2000, Ben & Jerry's and its independent Board were granted rights to take decisions about its social mission, but Unilever reserved primary responsibility for financial and operational decisions and therefore has the right to enter this arrangement.

> The new business arrangement follows a Unilever review of Ben & Jerry's in Israel after the brand and its independent Board announced last year its decision to discontinue sales of its ice cream in the West Bank.

> Unilever has used the opportunity of the past year to listen to perspectives on this complex and sensitive matter and believes this is the best outcome for Ben & Jerry's in Israel.  The review included extensive consultation over several months, including with the Israeli Government.

> Unilever rejects completely and repudiates unequivocally any form of discrimination or intolerance.  Antisemitism has no place in any society.  We have never expressed any support for the Boycott Divestment Sanctions (BDS) movement and have no intention of changing that position.

> Unilever is very proud of our business in Israel which supplies everyday household products to people across the country.  Today, Unilever Israel employs around 2,000 people of diverse backgrounds, has four local manufacturing plants, and works with a network of around 2,000 local suppliers and service providers – helping to support the livelihoods of tens of thousands of Israelis across its value chain.

Over the last decade, Unilever has invested more than 1 billion Shekels (around €250 million) in our business in Israel.  We look forward to continuing to make a positive contribution to Israel's economy and society for many decades to come, and hope that Israelis and Palestinians can reach a peaceful resolution of their conflict.

98.     A week later, on July 5, 2022, Ben & Jerry's responded with its own lawsuit against Conopco, filing a motion seeking a temporary restraining order and preliminary injunction to enjoin Conopco from "entering into or consummating any transaction that permits or would permit the licensing, sale, distribution, or use of Ben & Jerry's products in the West Bank" and from "performing any act under any agreement they have entered into that would permit the licensing, sale, distribution or use of Ben & Jerry's products in the West Bank." Conopco Action, ECF No. 18, Order to Show Cause; *Id.*, ECF No. 52, Order.

99.     On July 5, 2022, United States District Judge Andrew L. Carter, Jr. denied Ben & Jerry's motion for a temporary restraining order.  Conopco Action, ECF No. 18.  Thereafter, Judge Carter similarly denied Ben & Jerry's motion for a preliminary injunction on August 22, 2022.  ECF No. 52.

100.    On September 30, 2022, Ben & Jerry's filed an Amended Complaint, adding Unilever, and Unilever IP Holdings B.V. ("UIP") as defendants. *See* Conopco Action, ECF No. 58. The amended complaint asserts claims for breach of various agreements connected to Unilever's acquisition of Ben & Jerry's.

101.    In the amended complaint, Ben & Jerry's alleges that its merger with Unilever was conditioned on entry by Ben & Jerry's into a license agreement with Unilever N.V. (succeeded by UIP) and Unilever (the "Trademark License Agreement").  Ben & Jerry's alleges that, pursuant to the Trademark License Agreement, Ben & Jerry's was to retain ownership of is trademarks post-merger, thus ensuring that the B&J Board could effectively serve as the "custodian" of the Ben & Jerry's brand going forward.  Ben & Jerry's alleges, "Moreover, on July 11, 2022, Conopco revealed

that in 2000, mere months after the merger transaction was completed, Unilever had covertly caused the transfer of Ben & Jerry's trademarks to Unilever N.V., in direct violation of the License Agreement.  These actions breached the express terms of the Merger Agreement, Shareholders Agreement, and License Agreement, which were put in place to protect the brand and social integrity Ben & Jerry's has spent decades building."  The defendants in the action have not yet responded to the amended complaint.

102.   As one would expect, the relevant events have received widespread media coverage both domestically and internationally.  For example, a search for "Unilever" "Ben & Jerry" and "Israel" in Lexis's News database (which searches certain newswires, press releases, newspapers, magazines, journals, and aggregate news sources) for the week following Ben & Jerry's boycott announcement (*i.e*, from July 21, 2021 to July 28, 2021) yielded 240 results.  The same search through October 19, 2022 yielded 2,252 results.  Indeed, reports were published by The New York Times,[28] The Wall Street Journal,[29] CNBC,[30] Reuters,[31] the Financial Times,[32] the Jerusalem Post,[33] and Le Monde[34] among many other outlets.

---

[28]   *See, e.g.*, Eric Nagourney, *Ben & Jerry's to Stop Selling Ice Cream in Israeli-Occupied Territories*, THE NEW YORK TIMES (July 19, 2021), https://www.nytimes.com/2021/07/19/world/middleeast/israel-ben-jerrys-ice-cream.html; Vivian Giang, *Behind the fight between Ben & Jerry's and its owner, Unilever*, The New York Times (July 7, 2022), https://www.nytimes.com/2022/07/07/business/ben-jerry-unilever-israel.html.

[29]   *See, e.g.*, Kimberly Chin and Dov Lieber, *Ben & Jerry's to Stop Selling Ice Cream in West Bank Settlements, East Jerusalem*, THE WALL STREET JOURNAL (July 19, 2021), https://www.wsj.com/articles/ben-jerrys-to-stop-selling-ice-cream-in-west-bank-settlements-east-jerusalem-11626731469; Dov Lieber and Nick Kostov, *Ben & Jerry's Decision to Stop Sales in West Bank Puts Unilever in Tough Spot*, THE WALL STREET JOURNAL (July 20, 2021), https://www.wsj.com/articles/ben-jerrys-decision-to-stop-sales-in-west-bank-puts-unilever-in-tough-spot-11626799596?mod=Searchresults_pos2&page=1.

[30]   *See, e.g.*, *Ben & Jerry's to end ice-cream sales in occupied Palestinian territories*, CNBC (July 19, 2021), https://www.cnbc.com/2021/07/19/ben-jerrys-to-end-ice-cream-sales-in-occupied-palestinian-territories.html; Jason Gewirtz, *Texas and Florida get involved in Israel's fight with Ben*

103.    Professional investment analysts also noted the negative impact of the events on

Unilever.  Jeffrey Stent, an analyst at Exane BNP Paribas, stated in a September 14, 2021 analyst

report:

> ***This year has proven to be relatively damaging from a communications
> perspective***.  A brief reminder of the experience to date:
>
> *    *    *
>
> –**Israel:**  In July-21, Unilever's ice-cream business, Ben & Jerry's announced that to
> be consistent with its values, it would no longer sell ice cream in the Occupied
> Palestinian Territories.  ***Rightly or wrongly, this move served to give some investors***

---

*& Jerry's over West Bank boycott*, CNBC (July 22, 2021), https://www.cnbc.com/2021/07/22/texas-gets-involved-in-israels-fight-with-ben-jerrys-over-west-bank-boycott.html.

[31]  *See, e.g.*, Siddharth Cavale et al., *Ben & Jerry's to end ice-cream sales in occupied Palestinian territories*, Reuters (July 19, 2021), https://www.reuters.com/world/middle-east/ben-jerrys-end-ice-cream-sales-occupied-palestinian-territories-2021-07-19/; Dan Williams and Siddharth Cavale, *Israel PM warns Unilever boss over Ben & Jerry's boycott*, Reuters (July 20, 2021), https://www.reuters.com/world/middle-east/israel-pm-warns-unilever-severe-consequences-ben-jerrys-decision-2021-07-20/; Jessica DiNapoli, *Ben & Jerry's says Unilever froze directors' salaries*, Reuters (Aug. 3, 2022), https://www.reuters.com/business/retail-consumer/ben-jerrys-says-unilever-froze-directors-salaries-2022-08-03/.

[32]  *See, e.g.*, Tom Braithwaite, *Ben & Jerry's gives Unilever an ice cream headache*, The Financial Times (July 23, 2021), https://www.ft.com/content/1f89ac04-5a08-4297-9b6f-90d739211277; Patrick Temple-West, *Ben & Jerry's alleges Unilever 'usurped' company board in Israel dispute*, The Financial Times (Sept. 18, 2022), https://www.ft.com/content/6ccd205b-a30c-4b1e-8417-b63face0774c; Judith Evans, *Ben & Jerry's vs Unilever: how a star acquisition became a legal nightmare*, The Financial Times (Oct. 11, 2022), https://www.ft.com/content/30efd993-8c23-4f1b-9385-132bbba3d863.

[33]  *See, e.g.*, Tovah Lazaroff, Maayan Giloh, *Ben & Jerry's melts under BDS pressure, to stop selling in settlements*, The Jerusalem Post (July 20, 2021), https://www.jpost.com/breaking-news/ben-and-jerrys-to-end-sales-in-west-bank-674336; Gil Hoffman, *90 Knesset members send petition to Ben & Jerry's opposing boycott*, The Jerusalem Post (July 28, 2021), https://www.jpost.com/breaking-news/90-members-of-knesset-send-petition-to-ben-and-jerrys-675134.

[34]  *See, e.g.*, Clothilde Mraffko, *Ben & Jerry's ne vendra plus ses glaces dans les territoires palestiniens occupés par Israël*, Le Monde (July 21, 2021), https://www.lemonde.fr/international/article/2021/07/21/ben-amp-jerry-s-ne-vendra-plus-ses-glaces-dans-les-territoires-palestiniens-occupes-par-israel_6089020_3210.html.

*the impression that Unilever was putting what some perceive as being an increasingly woke agenda ahead of its commercial interests[.]*

104.    Another analyst, Bruno Monteyne (Senior Analyst, European Food and Home & Personal Care at Alliance Bernstein) concluded that Unilever's dispute with Ben & Jerry's could harm Unilever's turnaround attempt by damaging the Company's ability to acquire start-ups, a key source of fresh ideas for consumer goods companies, "Unilever's ability to acquire creative, alternative, forward-thinking, on-the-edge companies is *probably materially impacted by this*."[35]

## ADDITIONAL SCIENTER ALLEGATIONS

105.    Because Ben & Jerry's is a wholly owned subsidiary of Unilever, Unilever had the right to obtain meeting minutes and resolutions of the B&J Board at all times throughout the Class Period.  In addition, Unilever was aware of and had access to B&J Board resolutions through Ben & Jerry's CEO and B&J Board member McCarthy, whom Unilever appointed in 2018.

106.    Furthermore, the B&J Board's Chair (Mittal) stated that the board had been pushing to release a statement pledging to withdraw Ben & Jerry's products for months, but that senior Unilever executives became heavily involved due to the decision's political sensitivity.   NBC Report.

107.    Defendant Jope himself admitted that "[i]t's been a longstanding issue for Ben & Jerry's," and that "[w]e were aware of this decision by the brand and its independent board[.]"[36] *See also* Conopco Action, Close Declaration ¶11 ("*For the year following the Board's purported*

---

[35]    Judith Evans, *Ben & Jerry's vs Unilever: how a star acquisition became a legal nightmare*, THE FINANCIAL TIMES (Oct. 11, 2022), https://www.ft.com/content/30efd993-8c23-4f1b-9385-132bbba3d863.

[36]    Peter Belfiore and Ariel Zilber, *Longtime designer for Ben & Jerry's quits the company after 21 years, calling its boycott of sales in Israeli settlements a 'despicable trend' of anti-Zionism*, THE DAILY MAIL (July 26, 2021), https://www.dailymail.co.uk/news/article-9826409/Longtime-designer-Ben-Jerrys-quits-calling-boycott-despicable-trend-anti-Zionism.html.

resolution in July 2020, Unilever, Conopco, Ben & Jerry's CEO and the Board continued to debate whether and how to implement the Board's desired changes to the company's long-established operations in Israel and the Territories.").

108.     Unilever's 2019 Form 20-F also makes clear that the Individual Defendants were made aware of the B&J Board's resolution and the ensuing dispute in connection with Unilever's risk management, "Our approach to risk management is designed to provide reasonable, but not absolute, assurance that our assets are safeguarded, the risks facing the business are being assessed and mitigated and all information that may be required to be disclosed is reported to Unilever's senior management including, where appropriate, the Chief Executive Officer and Chief Financial Officer." 2019 Form 20-F at 32. See also 2020 Form 20-F at 44 (same language).

109.     Indeed, Unilever's efforts to conceal Ben & Jerry's boycott decision by delaying its announcement and then mischaracterizing the decision when it was announced, see ¶¶40-45, further demonstrates defendants' scienter because it confirms that defendants were aware of the negative consequences that a truthful announcement would have had.

## NO SAFE HARBOR

110.     The "Safe Harbor" warnings accompanying Unilever's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles ("GAAP"), including those filed with the SEC on Form 6-K, they are excluded from the protection of the statutory Safe Harbor.  See 15 U.S.C. §78u-5(b)(2)(A).

111.     Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and approved by an executive officer of Unilever who knew the FLS was false or misleading.  None

of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made; nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

112.    Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

113.    Plaintiffs and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Unilever ADRs was an efficient market at all relevant times by virtue of the following factors, among others: (a) Unilever ADRs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market; (b) Unilever regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (c) Unilever was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.   These reports were publicly available and entered the public marketplace.

114.    As a result of the foregoing, the market for Unilever ADRs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADRs.   Under these circumstances, all those who transacted in

Unilever ADRs during the Class Period suffered similar injury through their transactions in Unilever ADRs at artificially inflated prices, and a presumption of reliance applies.

115.    Without knowledge of the misrepresented or omitted material facts, Plaintiffs and other Class members purchased or acquired Unilever ADRs between the time defendants misrepresented and failed to disclose material facts and the time the facts were disclosed. Accordingly, Plaintiffs and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Unilever ADRs and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

116.    The market for Unilever ADRs was open, well developed, and efficient at all relevant times.  Throughout the Class Period, Unilever ADRs traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class (defined below) purchased or otherwise acquired Unilever ADRs, relying upon the integrity of the market price for Unilever ADRs and market information relating to Unilever, and they have been damaged thereby.

117.    When in July 2021, the relevant truth became known and the materialization of the risks that had been concealed by Defendants occurred, the price of Unilever ADRs declined immediately and precipitously because the artificial inflation was removed from the market price of the ADRs, causing substantial damage to Plaintiffs and the Class.

118.    On July 19, 2021, after the market had opened, Ben & Jerry's tweeted "Ben & Jerry's will end sales of our ice cream in the Occupied Palestinian Territory.  Read our full statement: [with this link to our website]."  Ben & Jerry's further explained on its website that, upon the expiration of its current license agreement with its Israeli manufacturer and distributor, Ben & Jerry's would no

longer be sold in the "Occupied Palestinian Territory," but that it would "stay in Israel through a different arrangement." *See supra* ¶¶42, 86.

119.    After the market closed that day, NBC reported more details concerning Ben & Jerry's decision and its dispute with Unilever about whether and how to implement the B&J Board's decision. *See supra* ¶¶44-45, 87.

120.    In response to this news, the price of Unilever ADRs closed down $0.58 per ADR on July 19, 2021 (approximately 1%) and down $0.75 per ADR on July 20, 2021 (approximately 1.3%), respectively.

121.    During the morning of July 22, 2021, CNBC reported that the states of Texas and Florida were examining Ben & Jerry's actions in connections with their states' Anti-BDS legislation. *See supra* ¶90.

122.    In response to this news, the price of Unilever ADRs closed down $3.19 per ADR that day (approximately 5.4%)

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of Unilever ADRs during the Class Period.  Excluded from the Class are defendants and members of their immediate families; the officers and directors of the Company at all relevant times and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which defendants have or had a controlling interest.

124.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Unilever ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records maintained by Unilever or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

126.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

127.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the Exchange Act was violated by Defendants as alleged herein; (b) whether statements made by Defendants misrepresented material facts about the business operations and management of Unilever; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

128.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

129.    Plaintiffs incorporate all of the preceding paragraphs by reference.

130.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases and acquisitions of Unilever ADRs during the Class Period.

132.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Unilever ADRs.  Plaintiffs and the Class would not have purchased Unilever ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

133.    Plaintiffs incorporate all of the preceding paragraphs by reference.

134.    The Individual Defendants acted as controlling persons of Unilever within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Unilever to engage in the wrongful conduct complained of herein.  Unilever controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and designating Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.      Awarding such equitable and injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: October 31, 2022                  ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         SAMUEL H. RUDMAN


                                         _/s/ Samuel H. Rudman_
                                         ——————————————————
                                         SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY 11747
                                         Telephone: 631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

- 43 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
rgonnello@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURA STEIN (*pro hac vice*)
261 Old York Road, Suite 507A
Jenkintown, PA  19046
Telephone:  215/988-9546
215/988-9885 (fax)
LStein@rgrdlaw.com

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Attorneys for Plaintiff*