# Exhibit 3

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
-----------------------

SCHEDULE 13D

UNDER THE SECURITIES EXCHANGE ACT OF 1934
-----------------------

BEN & JERRY'S HOMEMADE, INC.

(Name of Issuer)
-----------------------

CLASS A COMMON STOCK, PAR VALUE $.033 PER SHARE
(including the associated Class A Common Stock Purchase Rights)
and
CLASS B COMMON STOCK, PAR VALUE $.033 PER SHARE
(including the associated Class B Common Stock Purchase Rights)
(Titles of Classes of Securities)
-----------------------

081465106
081465205
(CUSIP Numbers)
-----------------------

RONALD M. SOIEFER, ESQ.
CONOPCO, INC.
390 PARK AVENUE
NEW YORK, NY 10022
(212) 888-1260
(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)
-----------------------

COPY TO:
RICHARD HALL, ESQ.
CRAVATH, SWAINE & MOORE
WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NEW YORK 10019
(212) 474-1000
-----------------------

APRIL 11, 2000

(Date of Event which Requires Filing of this Statement)
-----------------------

If the filing person has previously filed a statement on Schedule 13G to report
the acquisition that is the subject of this Schedule 13D, and is filing this
schedule because of SectionSection240.13d-1(e), 240.13d-1(f) or 240.13d-1(g),
check the following box / /.

NOTE: Schedules filed in paper format shall include a signed original and five
copies of the schedule, including all exhibits. See Section240.13d-7 for other
parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's
initial filing on this form with respect to the subject class of securities, and
for any subsequent amendment containing information which would alter
disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed
to be "filed" for the purpose of Section 18 of the Securities Exchange Act of
1934 ("Act") or otherwise subject to the liabilities of that section of the Act
but shall be subject to all other provisions of the Act (however, see the
Notes).

(Continued on following pages)

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------
Page 1 of 8

CUSIP NOS. 081465106
081465205


- -------------------------------------------------------------------

    1    Names of Reporting Persons
         Identification Nos. of Above Persons (entities only)
         VERMONT ALL NATURAL EXPANSION COMPANY
- -------------------------------------------------------------------

    2    Check the Appropriate Box if a Member of a Group (See
         Instructions)              (a) / /

OFFER TO PURCHASE FOR CASH
ALL OUTSTANDING SHARES OF CLASS A COMMON STOCK
(INCLUDING THE ASSOCIATED CLASS A COMMON STOCK PURCHASE RIGHTS)
AND
ALL OUTSTANDING SHARES OF CLASS B COMMON STOCK
(INCLUDING THE ASSOCIATED CLASS B COMMON STOCK PURCHASE RIGHTS)
OF
BEN & JERRY'S HOMEMADE, INC.
AT
$43.60 NET PER SHARE
BY
VERMONT ALL NATURAL EXPANSION COMPANY,
A WHOLLY OWNED SUBSIDIARY OF
CONOPCO, INC.,
A SUBSIDIARY OF
UNILEVER N.V.
------------

THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT,
NEW YORK CITY TIME, ON MONDAY, MAY 15, 2000, UNLESS THE OFFER IS EXTENDED.
-------------------

THE OFFER IS BEING MADE PURSUANT TO THE AGREEMENT AND PLAN OF MERGER DATED AS OF
APRIL 11, 2000, AMONG CONOPCO, INC., VERMONT ALL NATURAL EXPANSION COMPANY AND
BEN & JERRY'S HOMEMADE, INC. THE BOARD OF DIRECTORS OF BEN & JERRY'S
HOMEMADE, INC. HAS ADOPTED THE MERGER AGREEMENT AND APPROVED THE OFFER, THE
MERGER (EACH, AS DEFINED HEREIN) AND THE OTHER TRANSACTIONS CONTEMPLATED BY THE
MERGER AGREEMENT, DETERMINED THAT THE OFFER AND THE MERGER ARE FAIR TO AND IN
THE BEST INTERESTS OF THE COMPANY'S SHAREHOLDERS AND UNANIMOUSLY RECOMMENDS THAT
THE SHAREHOLDERS OF THE COMPANY ACCEPT THE OFFER AND TENDER THEIR SHARES (AS
DEFINED HEREIN) PURSUANT TO THE OFFER.
---------------------

THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (A) THERE BEING VALIDLY
TENDERED AND NOT WITHDRAWN PRIOR TO THE EXPIRATION OF THE OFFER SUCH NUMBER OF
SHARES THAT, TAKING INTO ACCOUNT THE CONVERSION OF THE CLASS B SHARES INTO CLASS
A SHARES (EACH AS DEFINED HEREIN), WOULD CONSTITUTE AT LEAST A MAJORITY OF THE
VOTING POWER OF THE COMPANY COMMON STOCK (AS DEFINED HEREIN), DETERMINED ON A
FULLY DILUTED BASIS, AFTER GIVING EFFECT TO THE EXERCISE OR CONVERSION OF ALL
OPTIONS, RIGHTS AND SECURITIES EXERCISABLE OR CONVERTIBLE INTO VOTING
SECURITIES, AND (B) THE WAITING PERIOD (AND ANY EXTENSION THEREOF) UNDER THE
HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT OF 1976, AS AMENDED, APPLICABLE TO
THE PURCHASE OF SHARES PURSUANT TO THE OFFER HAVING EXPIRED OR BEEN TERMINATED.
-------------------------

IMPORTANT

ANY SHAREHOLDER DESIRING TO TENDER ALL OR ANY PORTION OF SUCH SHAREHOLDER'S
SHARES SHOULD EITHER (1) COMPLETE AND SIGN THE LETTER OF TRANSMITTAL (OR A
FACSIMILE THEREOF) IN ACCORDANCE WITH THE INSTRUCTIONS IN THE LETTER OF
TRANSMITTAL, HAVE SUCH SHAREHOLDER'S SIGNATURE THEREON GUARANTEED IF REQUIRED BY
INSTRUCTION 1 TO THE LETTER OF TRANSMITTAL, MAIL OR DELIVER THE LETTER OF
TRANSMITTAL (OR SUCH FACSIMILE) AND ANY OTHER&sbsp;REQUIRED DOCUMENTS TO THE
DEPOSITARY AND DELIVER THE CERTIFICATES FOR SUCH SHARES TO THE DEPOSITARY ALONG
WITH THE LETTER OF TRANSMITTAL (OR SUCH FACSIMILE), OR, IN THE CASE OF A
BOOK-ENTRY TRANSFER EFFECTED PURSUANT TO THE PROCEDURES DESCRIBED IN SECTION 2,
DELIVER A DULY COMPLETED AND SIGNED LETTER OF TRANSMITTAL OR AN AGENT'S MESSAGE
(AS DEFINED HEREIN) AND ANY OTHER REQUIRED DOCUMENTS TO THE DEPOSITARY AND
DELIVER SUCH SHARES PURSUANT TO THE PROCEDURES FOR BOOK-ENTRY TRANSFER DESCRIBED
IN SECTION 2, IN EACH CASE PRIOR TO THE EXPIRATION OF THE OFFER, OR (2) REQUEST
SUCH SHAREHOLDER'S BROKER, DEALER, BANK, TRUST COMPANY OR OTHER NOMINEE TO
EFFECT THE TRANSACTION FOR SUCH SHAREHOLDER. A SHAREHOLDER HAVING SHARES
REGISTERED IN THE NAME OF A BROKER, DEALER, BANK, TRUST COMPANY OR OTHER NOMINEE
MUST CONTACT SUCH BROKER, DEALER, BANK, TRUST COMPANY OR OTHER NOMINEE IF SUCH
SHAREHOLDER DESIRES TO TENDER SUCH SHARES.

A SHAREHOLDER WHO DESIRES TO TENDER SHARES AND WHOSE CERTIFICATES FOR SUCH
SHARES ARE NOT IMMEDIATELY AVAILABLE OR WHO CANNOT COMPLY IN A TIMELY MANNER
WITH THE PROCEDURES FOR BOOK-ENTRY TRANSFER, OR WHO CANNOT DELIVER ALL REQUIRED
DOCUMENTS TO THE DEPOSITARY PRIOR TO THE EXPIRATION OF THE OFFER, MAY TENDER
SUCH SHARES BY FOLLOWING THE PROCEDURES FOR GUARANTEED DELIVERY SET FORTH IN
SECTION 2.

CLASS B SHARES ARE SUBJECT TO TRANSFER RESTRICTIONS AND THE ACCEPTANCE FOR
PAYMENT OF CLASS B SHARES TENDERED PURSUANT TO THE OFFER MAY RESULT IN A DEEMED
TRANSFER OF SUCH CLASS B SHARES AND THE AUTOMATIC CONVERSION THEREOF INTO
CLASS A SHARES.

QUESTIONS AND REQUESTS FOR ASSISTANCE OR FOR ADDITIONAL COPIES OF THIS OFFER
TO PURCHASE, THE LETTER OF TRANSMITTAL, THE NOTICE OF GUARANTEED DELIVERY OR ANY
OTHER TENDER MATERIALS MAY BE DIRECTED TO MORROW & CO., INC. OR TO MORGAN
STANLEY & CO. INCORPORATED AT THEIR RESPECTIVE ADDRESSES AND TELEPHONE NUMBERS
SET FORTH ON THE BACK COVER OF THIS OFFER TO PURCHASE.
------------------------------

THE DEALER MANAGER FOR THE OFFER IS:

MORGAN STANLEY DEAN WITTER

APRIL 18, 2000

SUMMARY TERM SHEET

cure period, the Company and Holdings may terminate the License Agreement if such Material Default is continuing.

The License Agreement also provides that the parties thereto will negotiate a mutually satisfactory master franchising agreement within 12 months of the date of the License Agreement.

OPTION AGREEMENT.  On April 11, 2000, the Company and Conopco entered into a Stock Option Agreement (the "Option Agreement"). Pursuant to the Option Agreement, the Company granted to Conopco an irrevocable option (the "Option") to purchase up to 1,219,986 Class A Shares (equivalent to 19.9% of the currently outstanding shares of Company Common Stock) at a purchase price of $43.60 per

28

Share. The Option is exercisable (in whole or in part) at any one time either (i) after the expiration of the Offer and the acceptance of Shares for payment pursuant thereto or (ii) after the termination of the Merger Agreement in circumstances in which Conopco is entitled to receive the Termination Fee (each, a "Purchase Event"). The Option terminates upon the earliest to occur of (i) the effective date of the Merger, (ii) 180 days after the first occurrence of a Purchase Event and (iii) termination of the Merger Agreement in accordance with its terms prior to and without the occurrence of a Purchase Event. After the occurrence of a Purchase Event, Conopco may elect to receive a cash payment from the Company in lieu of exercising its Option, which cash payment will be equal to (A) the aggregate market value of the Shares underlying the Option minus (B) the aggregate exercise price of the Option, subject to a cap of $500,000. In addition, pursuant to the Option Agreement, the Company granted registration rights to Conopco with respect to Shares purchased upon exercise of the Option.

PLANS FOR THE COMPANY

In the Merger Agreement, Conopco has agreed following the effective time of the Merger to maintain a board of directors of the Company (the "Surviving Corporation Board") composed of (i) seven directors from among the members of the Company Board and persons nominated by such continuing directors (collectively, from time to time, the "Class I Directors"), (ii) two members to be appointed by Meadowbrook Lane Capital (the "Class M Directors"), (iii) one member to be appointed by Conopco and (iv) the Chief Executive Officer of the Company following the effective time of the Merger (the "Surviving Corporation"). The Merger Agreement provides that the Surviving Corporation Board shall have primary responsibility with respect to the enhancement of the social mission priorities of the Company, as they may evolve, and the preservation of the essential integrity of the Ben & Jerry's brand-name. Conopco shall have primary responsibility in the area of financial and operational aspects of the Surviving Corporation and in all areas not allocated to the Surviving Corporation Board. The Chief Executive Officer of the Company shall manage the affairs of the Company pursuant to an annual delegation of authority and within the scope of an annual business plan approved by Conopco following good faith discussions with the Company Board. The Chief Executive Officer of the Company shall be designated by Conopco, after good faith consultation with, and the participation in discussions of, the Appointment Committee of the Surviving Corporation Board (consisting of Ben Cohen and Jerry Greenfield, unless they are not directors, in which case such committee shall include one or two directors, as the case may be, appointed by a majority of the Class I Directors, from among the Class I Directors and Class M Directors). The Surviving Corporation and Conopco have an understanding that the current Chief Executive Officer will remain during a transitional period. The Merger Agreement provides that the Company Charter and Company By-laws shall be amended to the extent necessary to implement the foregoing.

The Surviving Corporation has agreed in the Merger Agreement not to initiate any material headcount reductions for two years following the effective time of the Merger and to maintain for at least five years its corporate presence and substantial operations in Vermont. The Surviving Corporation has agreed in the Merger Agreement to establish a new product development unit responsible for special projects to be headed by Ben Cohen for so long as he is an employee. In addition, the Surviving Corporation has agreed to continue the Company's liveable wage policy following the effective time of the Merger and that a significant amount of the incentive-based compensation of members of the OCEO shall be based on the social performance of the Surviving Corporation.

The Company and Conopco have agreed that following the effective time of the Merger, they will work together in good faith to develop a set of social metrics to measure the social performance of the Surviving Corporation. The Surviving Corporation has also agreed to seek to have the rate of increase of such social metrics exceed the rate of increase of sales.

The Surviving Corporation has agreed in the Merger Agreement to establish a Social Venture Fund and agreed to fund such entity pursuant to an agreement to be made between the Surviving Corporation and the Foundation after the effective time of the Merger on such terms and conditions as they and a

29

committee of the Surviving Corporation Board, appointed in accordance with Section 6.14(e) of the Merger Agreement ("the Social Venture Committee") of the Surviving Corporation Board shall approve to provide venture financing to (a) vendors owned by women, minorities or indigenous people, (b) vendors which give priority to a social change mission, and (c) such other third-party entrepreneurial businesses within the scope of the Company's social mission priorities. The Company shall make available to the Social Venture Fund an aggregate amount of $5 million. The terms of any agreement relating to the Social Venture Fund shall limit the financial responsibility of the Surviving Corporation to the foregoing cash contributions.

The Surviving Corporation has also agreed to continue following the effective time of the Merger the Company's practice of making charitable contributions by making contributions, for a minimum of ten years, of $1.1 million per year adjusted annually (i) by multiplying such amount by the ratio of the U.S. Producer Price Index for the month of December of the year in which the determination is made to the U.S. Producer Price Index for December 1999 and (ii) by multiplying the product of such calculation by the ratio of the equivalent gallon sales of frozen dessert products bearing the Ben & Jerry's brand-name sold by any person in such year to the equivalent gallon sales of such products sold in 1999; PROVIDED, HOWEVER, that such ratio shall never be less than one. The Surviving Corporation Board shall have the responsibility for allocating annual contributions among The Ben & Jerry's Foundation, Inc. (the "Foundation"), local community charitable initiatives with the support and oversight of employee Community Action Teams and charitable institutions selected by the OCEO. The Surviving Corporation Board may allocate a portion of such contributions to the Foundation so long as (i) the Foundation does not significantly change its charitable purpose, (ii) none of the trustees of the Foundation disparages the Surviving Corporation, its products or its management and (iii) any replacement or additional trustee of the Foundation is reasonably satisfactory to Conopco. After such initial ten-year period, the Surviving Corporation shall continue to make contributions as calculated in accordance with the first sentence of this paragraph unless the activities and performance of the Foundation cease to be reasonably acceptable to Unilever, and provided that the Foundation meets the other requirements set out in the previous sentence.

DISSENTERS' RIGHTS

The holders of Shares do not have dissenters' rights as a result of the Offer. However, if the Merger is consummated, holders of Shares at the effective time of the Merger will have certain rights pursuant to the provisions of Chapter 13 of the VBCA ("Chapter 13") to dissent and obtain payment of fair value for their Shares. Under Chapter 13, dissenting shareholders who comply with the applicable statutory procedures will be entitled to receive a judicial appraisal of the fair value of their Shares (exclusive of any element of value arising from the accomplishment or expectation of the Merger) and to receive payment of such fair value in cash, together with accrued interest, if any. Any such judicial determination of the fair value of Shares could be based upon factors other than, or in addition to, the price per Share to be paid in the Merger or the market value of the Shares. The value so determined could be more or less than the price per Share to be paid in the Merger.

The foregoing summary of Chapter 13 does not purport to be complete and is qualified in its entirety by reference to Chapter 13. FAILURE TO FOLLOW THE STEPS REQUIRED BY CHAPTER 13 OF THE VBCA FOR PERFECTING DISSENTERS' RIGHTS MAY RESULT IN THE LOSS OF SUCH RIGHTS.

GOING-PRIVATE TRANSACTIONS

The Commission has adopted Rule 13e-3 under the Exchange Act, which is applicable to certain "going private" transactions. The Purchaser does not believe that Rule 13e-3 will be applicable to the Merger unless the Merger is consummated more than one year after the termination of the Offer. If applicable, Rule 13e-3 requires, among other things, that certain financial information concerning the fairness of the Merger and the consideration offered to minority shareholders in the Merger be filed with the Commission and disclosed to shareholders prior to the consummation of the Merger.

30

Except as otherwise described in this Offer to Purchase, Conopco and the Purchaser have no current plans or proposals that would relate to, or result in, an extraordinary corporate transaction involving the Company, such as a merger, reorganization or liquidation involving the Company or any of its subsidiaries, a sale or transfer of a material amount of assets of the Company or any of its subsidiaries, any change in the present Company Board or management of the Company including, but not limited to, any plans or proposals to change the number or term of directors or to fill any existing vacancies on the Company Board, any material change in the Company's present capitalization or dividend policy, any other material change in the Company's corporate structure or business, causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association or a class of equity securities of the Company becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act.

13. DIVIDENDS AND DISTRIBUTIONS

Pursuant to the terms of the Merger Agreement, the Company is prohibited from taking any of the actions described in the two succeeding paragraphs, and nothing herein shall constitute a waiver by the Purchaser or Conopco of any of its rights under the Merger Agreement or a limitation of remedies available to the Purchaser or Conopco for any breach of the Merger Agreement, including termination thereof.

If, on or after the date of the Merger Agreement, the Company should (a) split, combine or otherwise change the Shares or its capitalization, (b) acquire or otherwise cause a reduction in the number of outstanding Shares or other securities or (c) issue or sell additional Shares, shares of any other class of capital stock, other voting securities or any securities convertible into, or rights, warrants or options, conditional or otherwise, to acquire any of the foregoing, other than Shares issued pursuant to the exercise of outstanding Company Stock Options, then, subject to the provisions described in Section 14, the Purchaser may, in addition to its remedies under the Merger Agreement but subject to the terms thereof (which restrict the Purchaser from taking certain actions without the consent of the Company), make such

Exhibit (2)(b)

================================================================================

AGREEMENT AND PLAN OF MERGER

Dated as of April 11, 2000

Among

CONOPCO, INC.,

VERMONT ALL NATURAL EXPANSION COMPANY

And

BEN & JERRY'S HOMEMADE, INC.

================================================================================

TABLE OF CONTENTS

PAGE
----

ARTICLE I

THE OFFER AND THE MERGER

SECTION 1.01.   The Offer.................................................................2
SECTION 1.02.   Company Actions..........................................................4
SECTION 1.03.   The Merger...............................................................5
SECTION 1.04.   Closing..................................................................5
SECTION 1.05.   Effective Time...........................................................5
SECTION 1.06.   Effects..................................................................6
SECTION 1.07.   Articles of Incorporation and By-laws....................................6
SECTION 1.08.   Directors................................................................6
SECTION 1.09.   Officers.................................................................6

ARTICLE II

EFFECT ON THE CAPITAL STOCK OF THE
CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES

SECTION 2.01.   Effect on Capital Stock..................................................6
SECTION 2.02.   Exchange of Certificates.................................................8

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

SECTION 3.01.   Organization, Standing and Power.........................................10
SECTION 3.02.   Company Subsidiaries; Equity Interests...................................11
SECTION 3.03.   Capital Structure........................................................11
SECTION 3.04.   Authority; Execution and Delivery; Enforceability........................14
SECTION 3.05.   No Conflicts; Consents...................................................15
SECTION 3.06.   SEC Documents; Undisclosed Liabilities...................................16
SECTION 3.07.   Information Supplied.....................................................17
SECTION 3.08.   Absence of Certain Changes or Events.....................................18
SECTION 3.09.   Taxes....................................................................20
SECTION 3.10.   Absence of Changes in Benefit Plans......................................21
SECTION 3.11.   ERISA Compliance; Excess Parachute Payments..............................21
SECTION 3.12.   Litigation...............................................................24

PAGE
----

SECTION 3.13.   Compliance with Applicable Laws..........................................24
SECTION 3.14.   Environmental Matters....................................................24
SECTION 3.15.   Contracts; Debt Instruments..............................................26
SECTION 3.16.   Intellectual Property....................................................26
SECTION 3.17.   Labor Matters............................................................27

SECTION 3.18.  Title to Properties........................................................27
SECTION 3.19.  Equipment..................................................................28
SECTION 3.20.  Suppliers..................................................................28
SECTION 3.21.  Brokers; Schedule of Fees and Expenses.....................................28
SECTION 3.22.  Opinion of Financial Advisor...............................................29


                                ARTICLE IV

              REPRESENTATIONS AND WARRANTIES OF CONOPCO AND SUB

SECTION 4.01.  Organization, Standing and Power...........................................29
SECTION 4.02.  Sub........................................................................29
SECTION 4.03.  Authority; Execution and Delivery; Enforceability..........................29
SECTION 4.04.  Consents...................................................................30
SECTION 4.05.  Information Supplied.......................................................30
SECTION 4.06.  Brokers....................................................................31
SECTION 4.07.  Conopco Plans..............................................................31

                                ARTICLE V

                 COVENANTS RELATING TO CONDUCT OF BUSINESS

SECTION 5.01.  Conduct of Business........................................................31
SECTION 5.02.  No Solicitation............................................................35

                                ARTICLE VI

                          ADDITIONAL AGREEMENTS

SECTION 6.01.  Preparation of Proxy Statement; Shareholders Meeting.......................38
SECTION 6.02.  Access to Information; Confidentiality.....................................39
SECTION 6.03.  Best Efforts; Notification.................................................40
SECTION 6.04.  Stock Options .............................................................41
SECTION 6.05.  Benefit Plans .............................................................42
SECTION 6.06.  Indemnification............................................................43
SECTION 6.07.  Fees and Expenses; Liquidated Damages......................................44
SECTION 6.08.  Public Announcements.......................................................45




                                                                            PAGE
                                                                            ----

SECTION 6.09.  Transfer Taxes ............................................................46
SECTION 6.10.  Interim Directors..........................................................46
SECTION 6.11.  Company Capital Stock......................................................47
SECTION 6.12.  Rights Agreements; Consequences if Rights Triggered........................47
SECTION 6.13.  Shareholder Litigation.....................................................48
SECTION 6.14.  Operations of the Surviving Corporation....................................48
SECTION 6.15.  The Foundation.............................................................52
SECTION 6.16.  Certain Employee Matters...................................................52
SECTION 6.17.  Social Milestones..........................................................52
SECTION 6.18.  The Social Venture Fund....................................................53


                                ARTICLE VII

SECTION 7.01.  Conditions to the Offer....................................................53
SECTION 7.02.  Conditions to the Merger...................................................56

                                ARTICLE VIII

                    TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01.  Termination................................................................57
SECTION 8.02.  Effect of Termination......................................................59
SECTION 8.03.  Amendment..................................................................59
SECTION 8.04.  Extension; Waiver..........................................................60

SECTION 8.05.  Procedure for Termination, Amendment, Extension or Waiver..................60

                                ARTICLE IX

                           GENERAL PROVISIONS

SECTION 9.01.  Nonsurvival of Representations and Warranties..............................61
SECTION 9.02.  Notices....................................................................61
SECTION 9.03.  Definitions................................................................62
SECTION 9.04.  Interpretation; Disclosure Letters.........................................63
SECTION 9.05.  Severability...............................................................63
SECTION 9.06.  Counterparts...............................................................63
SECTION 9.07.  Entire Agreement; No Third-Party Beneficiaries.............................63
SECTION 9.08.  GOVERNING LAW..............................................................64
SECTION 9.09.  Assignment.................................................................64
SECTION 9.10.  Enforcement................................................................65




                                                                            PAGE

----
&sbsp;
SECTION 9.11.   Separate Parties.........................................................................................65

EXHIBIT A        Articles of Incorporation
EXHIBIT B        Form of Delegation of Authority


                    AGREEMENT AND PLAN OF MERGER, dated as of
                April 11, 2000, among CONOPCO, INC., a New York
                corporation ("CONOPCO"), VERMONT ALL NATURAL
                EXPANSION COMPANY, a Vermont corporation ("SUB"), and
                BEN & JERRY'S HOMEMADE, INC., a Vermont corporation
                (the "COMPANY").

          WHEREAS Conopco believes that it is uniquely positioned to
further the Company's three-part mission through a business combination that
leverages the strengths of both Conopco and the Company;

          WHEREAS the respective Boards of Directors of Conopco, Sub and
the Company have approved the acquisition of the Company by Conopco on the terms
and subject to the conditions set forth in this Agreement;

          WHEREAS, in furtherance of such acquisition, Conopco proposes
to cause Sub to make a tender offer (as it may be amended from time to time as
permitted under this Agreement, the "OFFER") to purchase all the outstanding
shares of Class A Common Stock of the Company, par value $.033 per share (the
"CLASS A COMMON STOCK"), including the associated Class A Rights (as defined in
Section 3.03), and all the outstanding shares of Class B Common Stock of the
Company, par value $.033 per share (the "CLASS B COMMON STOCK", and together
with the Class A Common Stock, the "COMPANY COMMON STOCK"), including the
associated Class B Rights (as defined in Section 3.03), at a price per share of
Company Common Stock (including the associated Company Right (as defined in
Section 3.03)) of $43.60, net to the seller in cash, on the terms and subject to
the conditions set forth in this Agreement;

          WHEREAS the respective Boards of Directors of Conopco, Sub and
the Company have approved the merger (the "MERGER") of Sub into the Company, or
(at the election of Conopco) the Company into Sub, on the terms and subject to
the conditions set forth in this Agreement, whereby (a) each issued share of
Company Common Stock not owned by Conopco, Sub or the Company, and (b) each
share of Company Common Stock, not owned directly or indirectly by Conopco or
the Company, shall be converted into the right to receive $43.60 in cash;

          WHEREAS, immediately following the acceptance for payment of
shares of Company Common Stock pursuant to the Offer, the Company shall cause
the outstanding shares




of the Company's $1.20 Class A Preferred Stock, par value $1.00 per share (the
"COMPANY PREFERRED STOCK" and, together with the Company Common Stock, the
"COMPANY CAPITAL STOCK"), to be redeemed;

          WHEREAS simultaneously with the execution and
delivery of this Agreement Ben & Jerry's Homemade Holdings,
Inc. and the Company are granting an international license
to Unilever N.V. and Unilever PLC pursuant to a License
Agreement (the "LICENSE AGREEMENT");

          WHEREAS simultaneously with the execution and delivery of this
Agreement the Company and Conopco are entering into a stock option agreement
(the "STOCK OPTION AGREEMENT" and, together with this Agreement and the License
Agreement, the "TRANSACTION AGREEMENTS"), pursuant to which the Company is
granting Conopco an option to purchase shares of Class A Common Stock on the
terms and subject to the conditions set forth therein; and

          WHEREAS Conopco, Sub and the Company desire to make certain
representations, warranties, covenants and agreements in connection with the
Offer and the Merger and also to prescribe various conditions to the Offer and
the Merger.

               NOW, THEREFORE, the parties hereto agree as follows:

                              ARTICLE I

                      THE OFFER AND THE MERGER

          SECTION 1.01. THE OFFER. (a) Subject to the conditions of this
Agreement, as promptly as practicable but in no event later than five business
days after the date of this Agreement, Sub shall, and Conopco shall cause Sub
to, commence the Offer within the meaning of the applicable rules and
regulations of the Securities and Exchange Commission (the "SEC"). The
obligation of Sub to, and of Conopco to cause Sub to, commence the Offer and
accept for payment, and pay for, any shares of Company Common Stock tendered
pursuant to the Offer are subject to the conditions set forth in Section 7.01.
The initial expiration date of the Offer shall be the 20th business day
following the commencement of the Offer (determined using Rule 14d-2 of the
SEC). Sub expressly

CEO; (ii) seven members to be composed of (A) such members of the Company Board (other than the current CEO and Ineligible Directors (as defined in Section 9.03)) as of the date hereof who wish to continue or rejoin as members of the Company Board following the Effective Time and (B) such other persons as may be necessary to fill any vacancies in the seven members as shall be designated for election by a majority of the persons specified in clause (A) (the "CLASS I DIRECTORS"); (iii) two members (the "CLASS M DIRECTORS") to be designated by Meadowbrook Lane, Inc. ("MEADOWBROOK"); and (iv) one member (together with any alternate that Conopco may from time to time designate, the "CLASS U DIRECTOR") to be designated by Conopco. The size of the Company Board shall be fixed at 11. Directors shall be elected for one year terms (subject to earlier removal, death or resignation), and a majority of directors then in office in each Class shall designate the candidates for election to the Company Board in such Class each year, and Conopco shall cause the election of such candidates and the CEO to the Company Board. Vacancies on the Company Board shall be

filled in a like manner. Conopco, as sole shareholder of the Surviving Corporation, shall remove any director of any Class at the written request of at least a majority of the directors of such Class then in office and shall not otherwise remove any member of the Company Board after the Effective Time, other than a Class U Director or the CEO following termination of his or her employment. No Ineligible Director shall be permitted at any time to be elected to the Company Board.

(b) Immediately following the Effective Time, the Surviving Corporation shall delegate authority to the CEO to manage the affairs of the Company, substantially in the form of Exhibit B, appropriately adjusted for inflation and other relevant factors. The Surviving Corporation, with the consent of Conopco, shall review on an annual basis the proper scope of such delegation and shall make a new delegation to the CEO as of January 1 of each year. Within the scope of the authority delegated by the Surviving Corporation to the CEO, the CEO may act without obtaining the prior approval of Conopco or the Company Board. The Company Board shall not alter or challenge in any way the scope of any delegation of authority by the Surviving Corporation to the CEO.

(c) Decisions with respect to the appointment, compensation and removal of the CEO shall be made by Conopco after good faith consultation with, and the participation in discussions of, an advisory committee of the Company Board (the "APPOINTMENT COMMITTEE") consisting of Ben Cohen ("B.C.") and Jerry Greenfield ("J.G."); PROVIDED, HOWEVER, that, if from time to time one or both of B.C. or J.G. is not a member of the Company Board, then a majority of the Class I Directors then in office shall appoint one or two, as the case may be, Class I Directors or Class M Directors to the Appointment Committee.

(d) Subject to Sections 6.14(e) and 6.14(f), which place primary responsibility for Social Mission Priorities and the Essential Integrity of the Brand (each as defined below) with the Company Board, the Surviving Corporation shall be managed by the CEO in accordance with an annual business plan. Each year the CEO shall present a business plan for the following year to Conopco and the Company Board. Conopco and the Company Board, in good faith consultation with each other, shall review the proposal and Conopco, the Company Board and the CEO shall use good faith efforts to reach agreement on the annual business plan. If such parties are unable to reach agreement on the annual business plan, the ultimate

determination of such plan shall be by Conopco. The annual business plan may be modified following the principles set out in the previous two sentences.

(e) The Company Board shall have primary responsibility for preserving and enhancing the objectives of the historical social mission of the Company as they may evolve from time to time consistent therewith ("SOCIAL MISSION PRIORITIES"). The Company Board shall work together with the CEO to integrate Social Mission Priorities into the business of the Surviving Corporation. The Company Board shall have a committee (the "SOCIAL VENTURE COMMITTEE") that shall oversee the Social Venture Fund (as defined below) consisting of one Class M Director, appointed by a majority of the Class M Directors then in office, and B.C., or, if B.C. is not a member of the Company Board, J.G., or, if neither B.C. nor J.G. is a member of the Company Board, a Class I Director appointed by a majority of the Class I Directors. Schedule 6.14 contains an illustrative list of Social Mission Priorities of the Company as of the date hereof.

(f) The Company Board shall be the custodians of the Ben & Jerry's-brand image and shall have primary responsibility for safeguarding the integrity of the essential elements of the Ben & Jerry's brand-name (the "ESSENTIAL INTEGRITY OF THE BRAND"). The Company Board shall work together with the CEO to provide that the business of the Surviving Corporation is conducted in a manner that preserves and enhances the Essential Integrity of the Brand. As part of this responsibility, the Company Board may prevent any action by the CEO in the areas of new product introduction, the changing of product standards and specifications, the approval of the content of marketing materials and the licensing or other use of the Ben & Jerry's trademark that, in each case, a majority of the Company Board reasonably determines to be inconsistent with the Essential Integrity of the Brand.

(g) The Company and Conopco shall work together to develop and mutually agree to a set of measures of the social performance of the Surviving Corporation ("SOCIAL METRICS"). The Surviving Corporation, under the direction of the Company Board, shall seek to have the Social Metrics of the Surviving

Corporation increase at a rate in excess of the rate of sales increases of the Surviving Corporation.

(h) The Surviving Corporation shall continue the Company's practice of making charitable contributions

by making contributions, for a minimum of ten years, of $1.1 million per year adjusted annually (i) by multiplying such amount by the ratio of the U.S. Producer Price Index for the month of December of the year in which the determination is made to the U.S. Producer Price Index for December 1999 and (ii) by multiplying the product of such calculation by the ratio of the equivalent gallon sales of Products bearing the Principal Licensed Mark (each as defined in the License Agreement) sold by any person in such year to the equivalent gallon sales of Products sold in 1999; PROVIDED, HOWEVER, that such ratio shall never be less than one. To the extent that a material portion of the Company's business consists of activities other than the manufacture and sale of Products, Conopco and the Surviving Corporation shall agree on an appropriate equivalent measure of sales volume for clause (ii) with respect to such non-Product activities. The Company Board shall have the responsibility for allocating annual contributions among The Ben & Jerry's Foundation, Inc. (the "FOUNDATION"), local community charitable initiatives with the support and oversight of employee Community Action Teams and charitable institutions selected by the OCEO. The Company Board may allocate a portion of such contributions to the Foundation so long as (i) the Foundation does not significantly change its charitable purpose, (ii) none of the trustees of the Foundation disparages the Surviving Corporation, its products or its management and (iii) any replacement or additional trustee of the Foundation is reasonably satisfactory to Conopco. After such ten year period, the Surviving Corporation shall continue to make contributions as calculated in accordance with the first sentence of this Section 6.14(h) unless the activities and performance of the Foundation cease to be reasonably acceptable to Unilever, and provided that the Foundation meets the other requirements set out in the previous sentence. The Company Board shall also be responsible for making the determination referred to in Section 6.05(d).

(i) Conopco shall not prevent the Surviving Corporation from fulfilling its obligations under this Section 6.14.

(j) Conopco shall have primary responsibility for the financial and operational aspects of the Surviving Corporation and the other aspects of the Surviving Corporation not allocated to the Company Board pursuant to this Section 6.14. Each member of the Company Board after the Effective Time and all employees of the Surviving Corporation shall agree to abide by the

Unilever Code of Business Conduct, and all employees of the Surviving Corporation shall agree to abide by Unilever's financial, accounting and legal procedures.

(k) Following the Effective Time, the Surviving Corporation shall establish a new product development unit responsible for special projects to be headed by B.C., for so long as B.C. is a member of the Company Board and an employee of the Surviving Corporation. The role of such unit shall include the test-marketing of new products to a reasonable extent, provided that such test-marketing is performed in conjunction with the Surviving Corporation's marketing department to ensure that proper measures are utilized to determine the success or failure of such test-marketing.

(l) The parties agree that the Company Charter and the Company By-laws shall be amended after the Effective Time to the extent necessary to implement the provisions contained in this Section 6.14, including if necessary the Surviving Corporation electing to become a close corporation in accordance with the provisions of the VBCA.

SECTION 6.15. THE FOUNDATION. Immediately prior to the Effective Time, the Surviving Corporation shall, and Conopco shall cause the Surviving Corporation to, make a one-time contribution of not less than $5 million to the Foundation so long as (i) the Foundation does not significantly change its charitable purpose, (ii) none of the trustees of the Foundation disparages the Surviving Corporation, its products or its management and (iii) any replacement or additional trustee of the Foundation appointed before the date of payment is reasonably satisfactory to Conopco.

SECTION 6.16. CERTAIN EMPLOYEE MATTERS. (a) The Surviving Corporation shall not, for a period of at least two years following the Effective Time, initiate any material headcount reduction of the employees of the Company, such headcount to be measured on a seasonal basis taking into account past employment practice by the Company.

(b) The Surviving Corporation shall maintain for a period of at least five years following the Effective Time its corporate presence and substantial operations in Vermont.

(c) The Surviving Corporation shall maintain the Company's current "liveable wage" policy in respect of employees of the Surviving

Corporation.

(d) Following the Effective Time, a significant amount of the incentive-based compensation of the OCEO shall be based on the social performance of the Surviving Corporation, and the Company Board shall be primarily responsible for the award of such social performance based amounts.

SECTION 6.17. SOCIAL MILESTONES. Following the Effective Time, Conopco shall cause the Parents to, and the Company shall, appoint John Elkington (or such other person as the parties may agree from time to time) (the "SOCIAL ADVISOR") to work with the Parents and the Company to develop a program of social milestones for the assessment of the Parents' efforts to incorporate socially responsible practices into their businesses, based on the Parents' social audit to be completed in the year 2000 (the "PARENTS SOCIAL AUDIT"), which will set out five-year performance goals with interim annual targets (the "SOCIAL MILESTONES"), each of the Social Milestones to be agreed between the Parents and the Company. The Social Advisor shall carry out an annual audit of the Parents' performance in relation to the Social Milestones, such audit to be publicly disseminated to the extent consistent with the dissemination of the Parents Social Audit, or, if the Parents Social Audit is not publicly disseminated, on a time frame and in a manner reasonably acceptable to the Parents and the Company Board, which manner shall include publication on the Parents' website. The reasonable fees of John Elkington shall be borne by Conopco or its affiliates.

SECTION 6.18. THE SOCIAL VENTURE FUND. Following the Effective Time, the Surviving Corporation shall establish an entity (the "SOCIAL VENTURE FUND") independent from the Foundation and the Surviving Corporation, such entity to be beneficially owned by the Foundation or another charitable foundation to be established by the Surviving Corporation (so long as such other charitable foundation constitutes an entity to which donations would be tax deductible under the U.S. Income Tax Code). The Surviving Corporation shall fund such entity pursuant to an agreement to be made between the Surviving Corporation and the Foundation after the Effective Time on such terms and conditions as they and the Social Venture Committee shall approve to provide venture financing to (a) vendors owned by women, minorities or indigenous people, (b) vendors which give

priority to a social change mission, and (c) such other third-party entrepreneurial businesses within the scope of the Company's Social Mission Priorities. The Surviving Corporation shall make available to the Social Venture Fund an aggregate amount of $5 million. The terms of any agreement relating to the Social Venture Fund shall limit the financial responsibility of the Surviving Corporation to the foregoing cash contributions.

ARTICLE VII

SECTION 7.01. CONDITIONS TO THE OFFER. Notwithstanding any other term of the Offer or this Agreement, Sub shall not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-l(c) under the Exchange Act (relating to Sub's obligation to pay for or return tendered shares of Company Common Stock promptly after the termination or withdrawal of the Offer), to pay for any shares of Company Common Stock tendered pursuant to the Offer unless (i) there shall have been validly tendered and not withdrawn prior to the expiration of the Offer such number of shares of Company Common Stock that, taking into account the conversion of the Class B Common Stock to Class A Common Stock, would constitute a majority of the combined voting power of the Company Common Stock (determined on a fully diluted basis, after giving effect to the exercise or conversion of all options, rights and securities exercisable or convertible into voting securities) (the "MINIMUM TENDER CONDITION"), (ii) the waiting period (and any extension thereof) under the HSR Act applicable to the purchase of shares of Company Common Stock pursuant to the Offer shall have expired or been terminated and (iii) the Company shall have mailed the notice of conversion described in Section 6.11(b) to all holders of Class B Common Stock following receipt of the notice specified in Section 6.11(b) and shall not have taken any action in violation of Section 6.11(b). Furthermore, notwithstanding any other term of the Offer or this Agreement, Sub shall not be required to accept for payment or, subject as aforesaid, to pay for any shares of Company Common Stock not theretofore accepted for payment or paid for, and may terminate or amend the Offer, with the consent of the Company, or if, at any time on or after the date of this Agreement and before

the acceptance of such shares for payment or the payment therefor, any of the following conditions exists:

(a) there shall be threatened by any Governmental Entity, or there shall be initiated or pending any suit, action, proceeding, application or counterclaims by any Governmental Entity or any other person, or before any court or governmental authority, agency or tribunal, domestic or foreign in each case that has a reasonable likelihood of success, (i) challenging the acquisition by Conopco or Sub of any Class A Common Stock, seeking to restrain or prohibit the making or consummation of the Offer or the Merger or any other Transaction, or seeking to obtain from the Company, Conopco or Sub any damages that are material in relation to the Company and its subsidiaries taken as whole, (ii) seeking to prohibit or limit the ownership or operation by the Company, Conopco or any of their respective subsidiaries of any material portion of the business or assets of the Company, Conopco or any of their respective subsidiaries,