UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
CITY OF ST. CLAIR SHORES POLICE AND :     Civil Action No. 1:22-cv-05011-LGS
FIRE RETIREMENT SYSTEM, Individually :
and on Behalf of All Others Similarly Situated, :     <u>CLASS ACTION</u>
                                :
               Plaintiff,    :
                                  :
     vs.                                    :
                                  :
UNILEVER PLC, ALAN JOPE, RITVA      :
SOTAMAA, and GRAEME PITKETHLY,    :
                                  :
            Defendants.    :
                                  :
———————————————————— x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS .................................................................................................3

    A.    Unilever..................................................................................................3

    B.    Unilever Acquires Ben & Jerry's Homemade, Inc. ................................3

    C.    A Dispute Arises Between Unilever and the B&J Board .......................4

    D.    The BDS Movement and Anti-BDS Legislation ...................................5

    E.    Defendants Failed to Disclose B&J's Boycott Decision, the Ensuing
        Intercorporate Dispute, and the Attendant Risks and Uncertainties ......6

    F.    The Truth Emerges ...............................................................................6

ARGUMENT ....................................................................................................................7

I.    PLAINTIFFS STATE A SECTION 10(b) CLAIM...........................................9

    A.    PLAINTIFFS PLEAD THAT DEFENDANTS MADE MISLEADING
        STATEMENTS AND OMISSIONS OF MATERIAL FACTS ............................9

        1.    Unilever Had a Duty to Disclose B&J's Boycott Decision, the
            Ensuing Dispute, and Resulting Risks and Uncertainties ............................9

        2.    Unilever's Risk Factor Descriptions Were Misleading ............................10

        3.    Unilever's 2020 Form 20-F Annual Report Violated Item 5 of
            Form 20-F by Failing to Meet the Standards Applicable per Item
            303 of Regulation S-K ............................................................................15

        4.    Defendants' Omissions Were Omissions of Material Fact.......................18

    B.    PLAINTIFFS PLEAD A STRONG INFERENCE OF DEFENDANTS'
        SCIENTER ......................................................................................................21

II.    PLAINTIFFS STATE A SECTION 20(a) CLAIM...........................................25

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009).................................................................................7

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................................................18

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ..................................................................17

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
  565 F. Supp. 3d 478 (S.D.N.Y. 2021).......................................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020).......................................................12

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012).......................................................21

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...........................................10

*City of Riviera Beach General Employees Retirement System v. Macquarie Infrastructure Corp.*,
  2021 WL 4084572 (S.D.N.Y. Sept. 7, 2021).............................................24

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
  2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .......................................18, 21

*Cooperman v. Individual Inc.*,
  171 F.3d 43 (1st Cir. 1999).......................................................................18

*Cresci v. Mohawk Valley Cmty. Coll.*,
  693 F. App'x 21 (2d Cir. 2017) ..................................................................25

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).......................................................................19

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).......................................................................24

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).....................................................19, 20

**Page**

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................9

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992)..............................................................15

*Glob. Network Commc'ns, Inc. v. City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006)...........................................................7, 8

*Greco v. Qudian Inc.*,
    2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)..................................16

*Gutman v. Lizhi Inc.*,
    2022 WL 4646471 (E.D.N.Y. Oct. 1, 2022).....................................16

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011).............................................................20

*IMG Mem'l Fund 1, LLC v. First Landing Fund, LLC*,
    2022 WL 826276 (S.D.N.Y. Mar. 18, 2022) ....................................23

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017).................................................13

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
    2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ...................................11

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................23

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021)....................................18

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)..............................................7, 8

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019) .........................................................12

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)..........................................11, 13

*In re Lehman Brothers Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)................................................8

*In re Ply Gem Holdings, Inc.*,
  2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)................................................................20, 21

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)....................................................................................11

*In re Seadrill Limited Securities Litigation*,
  2016 WL 3461311 (S.D.N.Y. June 20, 2016) ..............................................................24, 25

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)..............................................................................14

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) .................................................................16

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)..........................................................................................17, 20

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..........................................................................................24

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)........................................................................................19, 20

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).........................................................................................10, 11

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
  2022 WL 17815767 (2d Cir. Dec. 20, 2022) ...................................................................24

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................................8

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010)............................................................................................18, 20

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)........................................................................................9, 10, 15

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)...................................................................9, 18

*Press v. Chem. Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999)...........................................................................................18

Page

*Richman v. Goldman Sachs Grp., Inc.,*
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).....................................................................................12

*Roth v. Jennings,*
    489 F.3d 499 (2d Cir. 2007)..................................................................................................8

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008)..................................................................................................8

*Steamfitters' Industry Pension Fund v. Endo International PLC,*
    771 F. App'x 494 (2d Cir. 2019) .........................................................................................18

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015)...........................................................................................9, 10, 13

*Venkataraman v. Kandi Techs. Grp., Inc.,*
    2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022).....................................................................21

*Vladimir v. Bioenvision Inc.,*
    606 F. Supp. 2d 473 (S.D.N.Y. 2009).................................................................................12

*Wandel v. Gao,*
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)..................................................................................10

## STATUTES, RULES AND REGULATIONS

15 U.S.C
    §78j(b)....................................................................................................................... *passim*
    §78t(a)......................................................................................................................2, 25

Federal Rules of Civil Procedure
    Rule 12(b)(6).............................................................................................................7, 8, 12
    Rule 12(d) .........................................................................................................................8
    Rule 56(d) .........................................................................................................................8

17 C.F.R.
    §229.105.............................................................................................................................9
    §229.303.............................................................................................................................9
    §240.10b-5(b).................................................................................................................2, 9

Lead Plaintiff Westchester Teamsters Pension Fund and Teamsters Local 456 Annuity Fund and plaintiff City of St. Clair Shores Police and Fire Retirement System (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the Amended Complaint ("AC") (ECF No. 29) filed by defendant Unilever PLC ("Unilever" or the "Company") and individual defendants Alan Jope, Unilever's CEO (¶17); Graeme Pitkethly, Unilever's CFO (¶19); and Ritva Sotamaa, Unilever's Class Period Chief Legal Officer (¶18) (the "Individual Defendants" and, with Unilever, "Defendants") (ECF Nos. 30-32).[1]

## INTRODUCTION

Unilever is one of the world's largest consumer products companies, selling hundreds of brands in nearly 200 countries. Many of Unilever's brands were acquired from other companies. In fact, Unilever acquired Ben & Jerry's ice cream—one of Unilever's most successful brands—in 2000 when it acquired U.S. ice cream maker Ben & Jerry's Homemade, Inc. ("B&J"). B&J was well-known then, as it is today, for its luscious ice creams and its commitment to social activism. Because B&J's founders wanted to preserve their company's commitment to social activism, Unilever's acquisition had a number of unusual features. Most importantly here, B&J retains an independent board of directors responsible for preserving and enhancing B&J's social mission (the "B&J Board"). In July 2020, pursuant to its mandate, the B&J Board decided to take sides in the Israeli-Palestinian conflict by adopting a resolution (the "Resolution") to end sales of B&J ice cream in areas it deemed illegally occupied Palestinian territories. The board's decision precipitated a year-long dispute between Unilever and B&J over whether and how to implement the Resolution.

---

[1] "Class Period" refers to the period from September 2, 2020 through July 21, 2021. Unless stated otherwise, Plaintiffs use the following conventions: (i) capitalized terms not defined herein have the same meaning as those used in the AC; (ii) "¶__" references are to paragraphs in the AC; (iii) emphasis in quoted material is added and internal quotation marks and citations are omitted; (iv) page references are to a document's native pagination; and (v) Defendants' brief in support of their motion (ECF No. 31) is cited as "MTD."

This action arises from Defendants' Class Period misrepresentations and omissions concerning the risks and uncertainties Unilever faced as a result of the Resolution and the ensuing intercorporate dispute. Defendants move to dismiss Plaintiffs' fraud claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) on two grounds: (1) falsity; and (2) scienter. Defendants likewise move to dismiss Plaintiffs' control person claims under §20(a) of the Exchange Act on two grounds: (1) failure to plead a §10(b) claim; and (2) failure to allege the Individual Defendants' culpable participation (*i.e.*, scienter). Defendants' arguments lack merit.

Throughout the Class Period, Defendants made repeated representations regarding the risks and uncertainties that Unilever faced without ever discussing the Resolution or the resulting dispute between Unilever and B&J. The omission of this information concealed the nature, magnitude, and likelihood of the actual risks and uncertainties that Unilever faced, thereby misleading investors.

What's more, Defendants were well aware of the Resolution, the dispute, and that investors were being misled. Because B&J was a wholly-owned subsidiary of Unilever, Defendants had access to the Resolution and information about the adverse consequences of the B&J Board's decision. In addition, Unilever had selected and appointed Matthew McCarthy ("McCarthy") as B&J's CEO and a B&J Board member so that he could represent Unilever's interests and report back. In that capacity, McCarthy thwarted the implementation of the Resolution for approximately a year, until the B&J Board eventually informed Unilever that it was going public with its decision. Given the high-profile and controversial nature of the geopolitical issues involved, B&J's status as one of Unilever's marquee brands and most successful acquisitions, and the web of state laws that prohibit most U.S. states from doing business with or investing in companies that boycott Israel, it is no mystery why Unilever attempted to hide and hinder the Resolution and conceal the dispute.

Eventually, however, the truth emerged, resulting in a public outcry about the B&J Board's decision, and the price of Unilever ADRs predictably declined, damaging Plaintiffs and other Class members. This action seeks recovery under the federal securities laws on their behalf.

## STATEMENT OF FACTS

### A.    Unilever

Unilever is a British multinational corporation that is one of the world's largest consumer products companies. ¶¶2, 16, 24. It is divided into five distinct business groups: (1) Beauty & Wellbeing; (2) Personal Care; (3) Home Care; (4) Nutrition; and (5) *Ice Cream*. ¶24. Unilever sells more than 400 brands of products in over 190 countries, including well-known brands such as Hellmann's mayonnaise, Vaseline, Dove soap, and Ben & Jerry's ice cream. *Id*.

### B.    Unilever Acquires Ben & Jerry's Homemade, Inc.

B&J was founded in 1978 by Ben Cohen and Jerry Greenfield in Burlington, Vermont. ¶25. The two self-proclaimed "hippies" wanted their business to be about more than just selling ice cream, so they adopted a corporate model based on "linked prosperity," *i.e.*, the notion that, as B&J prospered, so too should its stakeholders. ¶26. As part of the model, B&J formally adopted a three-part mission: (1) to make fantastic ice cream (the "Product Mission"); (2) to manage the company for sustainable financial growth (the "Economic Mission"); and (3) to use the company in innovative ways to make the world a better place (the "Social Mission"). ¶27. From these humble beginnings, B&J experienced tremendous growth, ultimately becoming a publicly traded company well known both for its ice creams and its social activism. ¶¶3, 28.

In 2000, Unilever acquired B&J for $326 million. ¶¶3, 28. Because B&J's founders insisted on preserving B&J's commitment to its Social Mission, the acquisition included the creation of an independent B&J Board tasked with preserving and enhancing the objectives of the company's Social Mission. ¶¶3, 29. According to Richard Goldstein, Unilever's CEO of North America at the

time of the acquisition, "The only reason we were successful in the acquisition is because Ben and Jerry became convinced that Unilever would honor its word.  There was no point in buying the brand unless we could get the founders to agree that this is what they wanted."  ¶30.

Over 20 years later, B&J now stands as one of Unilever's most successful acquisitions and one of Unilever's marquee brands.  ¶31.  B&J is one of only thirteen Unilever brands with annual sales of over €1 billion; and in the United States, B&J is the top-ranked ice cream brand by sales, with approximately $1 billion in sales annually.  *Id.*

### C.    A Dispute Arises Between Unilever and the B&J Board

B&J currently operates as a wholly owned subsidiary of Conopco, Inc. ("Conopco") (d/b/a Unilever), a New York corporation headquartered in Englewood Cliffs, New Jersey. ¶32.  Conopco is an indirect, wholly owned subsidiary of Unilever and is B&J's sole shareholder.  *Id.*  The independent B&J Board consists primarily of social activists who joined long after Unilever's acquisition. ¶33.  The Board's Chairperson is Anuradha Mittal ("Mittal"), the founder and executive director of the Oakland Institute, a self-described "independent policy think tank."  *Id.*

Starting around 2014, outside organizations began calling upon B&J to stop selling ice cream in Israel in light of the Israeli-Palestinian conflict.  ¶35. In response, the B&J Board organized multiple trips to the region and appointed a special committee to review the issue.  *Id.*  As explained by Matt Close ("Close"), Unilever's Business Group President of Ice Cream, when Conopco acquired B&J in 2000, B&J had an existing license relationship dating back to 1987 with its Israeli distributor, Avi Zinger ("Zinger") and his affiliated companies, including American Quality Products Ltd. ("AQP") (the "AQP License Agreement").  The AQP License Agreement, as renewed and amended over the years, gave AQP exclusive rights to manufacture and distribute B&J ice cream in Israel and the "occupied territories" under Israeli control (the "Territories"), until December 31, 2022.  ¶34.

On multiple occasions between 2018 and 2021, Zinger informed the B&J Board that it would violate both Israel's anti-discrimination law and Israel's anti-boycott laws for AQP to cease distribution of B&J products in the Territories.  ¶36.  Zinger further explained that violating these laws could subject AQP to fines, criminal prosecution, and the loss of government benefits.  *Id*.  In February 2020, Zinger wrote to McCarthy and Mittal asking B&J to extend the AQP License Agreement beyond 2022 so that AQP could make necessary long-term investments. ¶¶6, 37. McCarthy promptly responded, copying Mittal, indicating that he agreed to an extension.  ¶38.

In July 2020, however, the B&J Board decided against renewal, instead passing the Resolution to end sales of B&J ice cream in the Territories.  ¶¶4, 39.  This decision precipitated a year-long dispute involving Unilever, McCarthy, and the B&J Board over whether and how to implement the B&J Board's decision.  ¶¶4, 6.  According to Mittal, McCarthy chose not to "operationalize" the Resolution immediately, thereby thwarting the B&J Board's decision.  ¶40. According to Close, "***Unilever's goal was to find an outcome that mitigated the risks to Unilever*** while also respecting the Board's new position regarding business in Israel and the Territories." ¶41. In other words, Unilever disagreed with the B&J Board's decision, recognized the adverse consequences, and sought to delay implementation of the Resolution for as long as possible.

### D.    The BDS Movement and Anti-BDS Legislation

The decision by the B&J Board appears to arise out of the boycott, divestment, and sanctions ("BDS") movement, a controversial pro-Palestinian movement that advocates for tactics designed to exert economic and political pressure on Israel.  ¶46.  The U.S. House of Representatives passed a resolution condemning the BDS movement on July 24, 2019 by a vote of 398-17.  *Id*.  Further, 35 U.S. states have adopted laws, executive orders, or resolutions aimed at discouraging boycotts, divestment, and sanctions of Israel ("Anti-BDS Legislation").  ¶47.  The consequences for a

company violating Anti-BDS Legislation range from being barred from doing business with state entities to having state entities divest any investments they may have in the company.  *Id.*

### E.    Defendants Failed to Disclose B&J's Boycott Decision, the Ensuing Intercorporate Dispute, and the Attendant Risks and Uncertainties

This case arises from misleading statements and omissions in Unilever SEC filings detailing Unilever's "Principal Risk Factors" (including Unilever's customer, ethical, and legal risks), as well as management's discussion of known events, trends, and uncertainties that Unilever faced.  ¶¶5, 52-84.  By failing to discuss the B&J Board's Resolution, the intercorporate dispute, and the impact of both on Unilever's reputation, financial operations, regulatory compliance, and ability to make future acquisitions, Defendants mislead reasonable investors as to the nature, magnitude, and probability that the relevant risks had already or would transpire.  *Id.*

### F.    The Truth Emerges

After a year-long dispute, Mittal ultimately informed Unilever in July 2021 that the B&J Board intended to announce its decision to the public.  ¶42.  On July 19, 2021, after the market opened, B&J announced on its website and through its Twitter account that, upon the expiration of the existing license agreement, B&J would end sales of its ice cream in "Occupied Palestinian Territory," but that "we will stay in Israel through a different arrangement."  ¶¶8, 42, 86.  Unilever followed up with a similar statement, echoing "that Ben & Jerry's will stay in Israel."  ¶¶8, 43.

In a separate statement reported by *NBC News* after the market closed on July 19, 2021, the B&J Board disputed that Unilever had the authority to promise that B&J would remain in Israel:

> ***The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory (the OPT) does not reflect the position of the independent board, nor was it approved by the independent board***.  By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, ***Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement***.

¶¶8, 44, 87.  According to Mittal, the B&J Board had been pushing to withdraw *for years*.  ¶¶45, 87. Furthermore, the B&J Board wanted to release a different statement, reviewed by NBC News, that made no reference to continued sales in Israel—a decision that Mittal said would require B&J Board approval.  ¶¶8, 45, 87.  Referring to the Unilever announcement, Mittal said, "I am saddened by the *deceit* of it."  ¶¶45, 87.  NBC News additionally reported that the B&J Board passed the Resolution in July 2020, but that B&J's CEO, a Unilever appointee, "never operationalized it."  ¶8.  In response to this news, the price of Unilever ADRs closed down $0.58 per ADR on July 19, 2021 (approximately 1%), and closed down $0.75 per ADR on July 20, 2021 (approximately, 1.3%), respectively.  ¶88.

On July 20, 2021, Israeli Prime Minister Naftali Bennett described the decision as a "clearly anti-Israel step," adding that the move would have "serious consequences, legal and otherwise." ¶¶9, 89.  Two days later, CNBC reported that Texas and Florida were examining B&J's actions in connection with their respective anti-BDS Legislation.  ¶¶9, 90.  In response to this news, the price of Unilever ADRs closed down $3.19 per ADR that day, approximately 5.4%.  ¶91.

## ARGUMENT

In ruling on a Rule 12(b)(6) motion, the Court must accept as true the facts alleged and draw all reasonable inferences in the nonmoving parties' favor.  *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154 (2d Cir. 2006).  A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 1960 (2009).  The Court's function is "not to weigh the

evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 456 (S.D.N.Y. 2017).[2]

On a Rule 12(b)(6) motion, courts are generally precluded from considering matters outside the pleading unless the court converts the motion to one for summary judgment and grants the nonmoving party the opportunity to respond after conducting discovery. *See* Fed. R. Civ. P. 12(d), 56(d); *Glob. Network Commc'ns*, 458 F.3d at 155.

Defendants seek to introduce 13 exhibits with their motion. Defendants attempt to invoke the judicial notice and incorporation-by-reference exceptions for these exhibits. MTD at 2 n.2. Defendants do not however identify the adjudicative facts they seek the Court to judicially notice. Nor do they explain how Exhibits 1, 3, 8, 9, 10, and 12 are incorporated by reference. The documents are not attached to the AC, are not expressly incorporated by reference in the AC, and are not documents "upon which [the complaint] ***solely*** relies and which [are] ***integral to the complaint***." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Glob. Network Commc'ns*, 458 F.3d at 156-57 (limited quotations of a document are insufficient to render the document incorporated).

Additionally, the Court is precluded from considering documents for a hearsay, irrelevant, or otherwise inadmissible purpose. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (judicial notice of facts based on hearsay is improper); *In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 273 (S.D.N.Y. 2011) (even if incorporated by reference, a document cannot be considered "for the truth of the matters asserted").

Thus, the Court should strike or decline to consider the exhibits.

---

[2]    *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.").

## I.      PLAINTIFFS STATE A SECTION 10(b) CLAIM

Under Section 10(b) and Rule 10b-5(b), "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Defendants argue that Plaintiffs fail to plead: (1) any material misstatements or omissions; and (2) scienter. As explained below, Defendants are incorrect.

### A.      PLAINTIFFS PLEAD THAT DEFENDANTS MADE MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

#### 1.      Unilever Had a Duty to Disclose B&J's Boycott Decision, the Ensuing Dispute, and Resulting Risks and Uncertainties

Two circumstances present here imposed a duty on Defendants to disclose the Resolution, the intercorporate dispute, and the attendant risks and uncertainties. First, "a duty may arise when there is . . . a statute or regulation requiring disclosure." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Item 105 (formerly Item 503(c)) of Regulation S-K required Unilever to disclose in its Form 20-F Annual Reports the most "material factors that make an investment in the registrant or offering speculative or risky."[3]  *See* Item 105 of Regulation S-K, 17 C.F.R. §229.105; SEC Release No. 5206, FAST Act Modernization & Simplification of Regulation S-K, (Mar. 20, 2019); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7-*13 (S.D.N.Y. Sept. 27, 2020). Additionally, Item 303 of Regulation S-K, 17 C.F.R. 229.303, imposes a disclosure duty in Form 20-F Annual Reports "where a ***trend***, demand, commitment, ***event*** or ***uncertainty*** is both [1] presently known to management and [2] reasonably likely to have material effects on the

---

[3]      As of May 2, 2019, Item 503(c) was reorganized as Item 105, though the disclosure requirements were unchanged. *See* FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674, 12688, 12712 (2019).

registrant's financial condition or results of operations."[4]   *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *see also* ¶¶69-74.

Second, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an ***issue*** or ***topic***, there is a duty to tell the whole truth."  *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 & n.3 (2d Cir. 2014).  By enumerating and discussing Unilever's "Principal Risk Factors" (*see, e.g.*, ¶¶52, 56, 58, 61, 64, 68, 77, 81, 83), including customer (*see* ¶¶53, 59, 62, 65, 78, 84), ethical (*see* ¶¶54, 59, 62, 66, 79, 84), and legal (*see* ¶¶55, 56, 59, 62, 67, 80, 84) risks, and by representing that Unilever's principal risks had not changed (*see, e.g.*, ¶¶52, 64), Defendants had a duty to speak truthfully, accurately, and completely about ***all of*** Unilever's "Principal Risk Factors," including those it specifically identified and described.[5]

## 2.    Unilever's Risk Factor Descriptions Were Misleading

SEC Rule 10b-5(b) renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b).

A company's risk disclosures are actionable when the language: (1) misrepresents or omits a material fact;[6] (2) discusses a risk but fails to disclose that the risk has already materialized;[7] or

---

[4]    Defendants concede that the SEC's interpretations of Item 303 apply to the Management Discussion & Analysis disclosures drafted by foreign issuers pursuant to Item 5 of Form 20-F.  MTD at 17.  The failure to make a material disclosure required by Item 303 can serve as the basis for a claim under Section 10(b) and Rule 10b-5 provided that the other elements have been sufficiently pleaded.  *Stratte-McClure*, 776 F.3d at 101-04.

[5]    In light of these disclosure obligations, Defendants are incorrect that Unilever had unfettered discretion as to when it was required to disclose the omitted information.  MTD at 16-17.  Similarly, Defendants' argument that Plaintiffs are attempting to plead fraud-by-hindsight is belied by the fact that the Resolution which precipitated the dispute was passed in July 2020, months ***before*** the September 2, 2020 start of the Class Period.

[6]    *See, e.g.*, *JinkoSolar Holdings*, 761 F.3d at 250 (company described prophylactic steps it was taking to prevent pollution without disclosing that the steps were then failing).

[7]    *See, e.g.*, *Wandel v. Gao*, 590 F. Supp. 3d 630, 643 (S.D.N.Y. 2022) ("generic, forward-looking risk statements cannot absolve an issuer who faces risks that have already transpired"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 25, 2013) ("Even assuming that Defendants sufficiently identified the correct risk

(3) otherwise omits facts that would significantly impact a reasonable investor's risk probability calculations.[8]  Relatedly, "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability."  *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020).  *See also In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) ("To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the "***risk of real deception drops to <u>nil</u>***."'").

Unilever's Class Period risk disclosures, including those in Unilever's 2020 Form 20-F Annual Report, ¶¶63-68, and those in SEC filings that incorporated Unilever's risk disclosures from its 2019 and 2020 Form 20-F Annual Reports, ¶¶52-62, 76-84, were misleading because they omitted any mention of the Resolution, the ensuing dispute, and the potential impact on Unilever's reputation, financial operations, regulatory compliance, and ability to make future acquisitions, thereby misleading reasonable investors as to the nature, magnitude, and probability that the relevant risks had already or were likely to transpire.  *See* ¶¶52-68, 76-84.

In describing Unilever's customer risks, Unilever represented that "***Successful customer relationships are <u>vital to our business and continued growth</u>***," and that "***Maintaining strong relationships with our <u>existing</u> customers . . . [is] <u>necessary</u> to ensure our brands are well presented to our customers and available for purchase <u>at all times</u>***."  *See* ¶¶53, 59, 62, 65, 78, 84. Unilever then warned that "***Failure to maintain strong relationships with customers <u>could</u>***

---

factors for the public," "the disclosures failed to warn investors that the risks were not hypothetical—which, of course, dramatically increased the possibility of adverse consequences.").

[8]        *See, e.g.*, *JinkoSolar Holdings*, 761 F.3d at 251 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[E]ven apparently specific risk disclosures . . . are misleading if the risks are professionally stamped in internal undisclosed analyses . . . as significantly greater or more certain than those portrayed in the prospectus.").

***negatively impact our terms of business with affected customers and reduce the availability of our products to customers***." *Id*. When viewed separately and in combination, these statements were misleading in context due to the omission of the B&J Board's decision to terminate "customer relationships" and product availability "at all times" to "existing customers" in "Occupied Palestinian Territory" (¶¶42, 53).[9] The statements implied that no such actions had been taken and that no such risk had already materialized or was likely to. ¶¶56, 59, 62, 68, 81, 84. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278 (S.D.N.Y. 2012) ("[B]y putting the topic of the cause of its financial success at issue, [a company] then [] is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 409 (S.D.N.Y. 2020) ("Warning of risks that ***could*** occur at some ***future date*** does not warn investors that those risks have ***already come to pass***."). Additionally, these statements concealed the risk of a customer backlash in Israel and elsewhere among consumers who disagreed with the B&J Board's decision or were required by Anti-BDS Legislation not to do business with companies who boycott Israel. ¶¶56, 59, 62, 68,

---

[9]    Defendants' efforts to dispute and mischaracterize the B&J Board's decision and the ensuing dispute as "inchoate policies" and merely a "potential course of action [that was] undecided and still subject to *internal* discussions and debate," MTD at 14 (original emphasis), is improper under Rule 12(b)(6). Plaintiffs allege that the B&J Board, within the purview of its Social Mission mandate (¶¶3, 29-30), made a ***final*** corporate decision when it passed the Resolution. *See, e.g.*, ¶¶4-6, 8, 39-41. Plaintiffs further allege that Unilever, through its hand-selected B&J Board member and B&J CEO (McCarthy), then took steps as part of the dispute to thwart and delay implementation of the Resolution. *See, e.g.*, ¶¶4-6, 40-42, 87, 104-107. Outside of this litigation, Unilever conceded that the B&J Board acted within its Social Mission mandate. *See* ¶43 (In its July 19, 2021 statement about B&J's decision, Unilever acknowledged, "[A]s part of the acquisition agreement, ***we have always recognized the right of the brand and its independent Board to take decisions about its social mission***."); ¶107 n.36 (citing a July 26, 2021 Daily Mail article wherein defendant Jope admitted Unilever "***cannot force its subsidiary, Ben & Jerry's, to reverse its decision to stop selling ice cream in Jewish settlements on the Israeli-occupied West Bank***"). Accordingly, Defendants' arguments and citations to cases involving early stage merger negotiations or preliminary internal discussions are inapposite. *See* MTD at 14 (citing, *e.g.*, *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 495 (S.D.N.Y. 2021); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485-86 (S.D.N.Y. 2009); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13-14 (2d Cir. 2019)).

81, 84.[10] *See also Facebook*, 986 F. Supp. 2d at 516 ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").[11]

In describing Unilever's ethical risks, Unilever acknowledged that "***Unilever's brands and reputation are valuable assets and the way in which we operate, contribute to society and engage with the world around us is always under scrutiny both internally and externally***," and that "***Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is <u>essential for the protection of the reputation of Unilever and its brands</u>***." ¶¶54, 59, 62, 66, 79, 84.  Unilever then warned that "***Failure to meet these high standards <u>could</u> result in damage to Unilever's corporate reputation and business results***."  *Id.*  When viewed separately and in combination, these statements were misleading in context due to the omission of the B&J Board's boycott decision.  A reasonable investor would conclude from these statements that "Unilever and its brands" had not taken any actions "[in]consistent with the expectations of customers, consumers and other stakeholders" that would jeopardize "the reputation of Unilever and its brands," such as by taking a stand on a hot-button geopolitical issue that was certain to cause controversy among some of the Company's "customers, consumers and other stakeholders," would violate Anti-BDS Legislation enacted by most U.S. states, and would materially change the probability that such risks had or would materialize.[12]  ¶¶54, 56, 59, 62, 68, 81, 84.  Additionally, by omitting information

---

[10]    Indeed, when the B&J Board's boycott decision was disclosed, an intense negative reaction occurred among Israeli consumers and politicians (¶93), certain supermarkets outside of Israel reduced shelf-space for Unilever's ice cream (¶94), and Florida added Unilever to Florida's Scrutinized Companies that Boycott Israel List, which meant that the company would not be able to enter or renew contracts with the state or any municipality in Florida (*see* ¶90).

[11]    *See also Stratte-McClure*, 776 F.3d at 105-06 ("generic cautionary language" about "the deterioration of the real estate, credit, and subprime mortgage markets, and its potential negatively to affect Morgan Stanley" was insufficient when defendant should have disclosed more specifically "that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposure to those markets, and that if the trends came to fruition, the company faced trading losses that could materially affect its financial condition").

[12]    *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("By touting its commitment to safety [over and over], BHP put the topic 'at issue' such that we cannot say that, as a matter of law, investors would not find these representations material."); *Facebook*, 986 F. Supp. 2d at 516 ("Courts in this Circuit have held that a

concerning Unilever's dispute with the B&J Board, which Unilever conceded was within the B&J Board's Social Mission mandate,[13] Unilever concealed the risks to its reputation and ability to make future acquisitions.[14]  ¶¶56, 59, 62, 68, 81, 84.

In describing Unilever's legal risks, Unilever acknowledged that "***Compliance with laws and regulations is an <u>essential part of Unilever's business operations</u>***," and that "***Unilever is subject to national and regional laws and regulations[.]***"  ¶¶55, 59, 62, 67, 80, 84.  Unilever then warned that "***Failure to comply with laws and regulations <u>could</u> expose Unilever to civil and/or criminal actions leading to damages, fines and criminal sanctions against us and/or our employees with possible consequences for our corporate reputation***."  *Id.*  When viewed separately and in combination, these statements were misleading in context due to the omission of a discussion of the B&J Board's boycott decision, which violated U.S. Anti-BDS Legislation.  The statements implied that no such action had been taken and that no such risk had already transpired or was likely to.[15]  ¶¶56, 59, 62, 68, 81, 84.  *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400, 415 (S.D.N.Y. 2005) (parent company's cautionary statements purporting to warn that a company's business "could" be negatively impacted "if" it failed to comply with industry regulations

---

company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

[13]     *See supra* n.9; ¶¶3, 29-30 (B&J Board origin); ¶35 (B&J Board conducted multiple trips to the region and appointed special committee to review the issue); ¶41 (Unilever acknowledging efforts at "respecting the [B&J] Board's new position regarding business in Israel and the Territories").

[14]     *Compare* ¶30 (statement by Unilever executive that the "only reason" Unilever was able to acquire B&J was because the eponymous Ben and Jerry were convinced Unilever would honor its word regarding B&J's ability to continue its Social Mission); ¶104 (securities analyst concluding that Unilever's dispute with B&J could harm Unilever's turnaround attempt as it was "***probably material***" to Unilever's ability to acquire startups).

[15]     *Compare* ¶90 (initial comments from government officials in Texas and Florida regarding the boycott); ¶95 (the states of New York, New Jersey, Florida, Texas, Illinois, Colorado, and Arizona ultimately announced decisions to divest their state's pension fund investments in Unilever due to violations of each state's respective Anti-BDS Legislation ***even though the AQP License Agreement had yet to expire***).  Defendants' suggestion that the Resolution had to be announced in order to be illegal has no basis in logic or Anti-BDS Legislation.

were materially misleading where the company's subsidiary was violating industry regulations at the time it issued those purported warnings).

Furthermore, by representing that no changes had occurred to the Company's principal risks since its prior filings, notwithstanding the Resolution, the ensuing dispute, and the risks attendant thereto (¶¶52, 56, 64, 68, 77, 81), Defendants' statements were materially misleading in light of the new events that changed Unilever's changed risk profile. *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate.").

Lastly, assuming *arguendo* that the Resolution, the ensuing dispute, and the risks attendant thereto were not topics and issues put into play by Defendants' descriptions of Unilever's customer, ethical, and legal risks, and the lack of changes thereto, Unilever had an independent duty to separately identify and discuss those facts and attendant risks under Item 105 of Regulation S-K.

### 3.    Unilever's 2020 Form 20-F Annual Report Violated Item 5 of Form 20-F by Failing to Meet the Standards Applicable per Item 303 of Regulation S-K

Item 303 of Regulation S-K sets forth an affirmative disclosure duty "where a ***trend***, demand, commitment, ***event*** or ***uncertainty*** is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."[16] *Ikanos Commc'ns*, 681 F.3d at 120; *see also* ¶¶69-74.    As explained in Section I.B. below, Defendants had actual knowledge of the Resolution and the ensuing dispute.    Defendants were likewise aware that these facts—whether characterized as "events," "uncertainties," or "trends"— yielded the potential for customer backlash, lost sales, lost government contracts, divestments of Unilever securities by U.S. state entities, Israeli nondiscrimination, anti-boycott, and antitrust

---

[16]    Defendants concede that the SEC's interpretations of Item 303 apply to the Management Discussion & Analysis disclosures drafted by foreign issuers pursuant to Item 5 of Form 20-F.    MTD at 17.

enforcement actions, and harm to Unilever's reputation including harm to its ability to acquire

startups due to a perception that Unilever had not honored its commitment to B&J's founders.

Undoubtedly, these issues served at least as part of Unilever's rationale for delaying the B&J Board

from operationalizing its decision even though Unilever believed the Resolution was within the B&J

Board's Social Mission mandate.  *See supra* n.9.

As explained by the SEC in a May 1989 interpretive release on Item 303, once management

is aware of an event, uncertainty, or trend, management must make two assessments to determine

whether disclosure is required:

> (1) Is the known **trend**, demand, commitment, **event** or **uncertainty** likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate **objectively** the consequences of the known **trend**, demand, commitment, **event**, or **uncertainty**, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

> Each final determination resulting from the assessments made by management must be **objectively** reasonable, **viewed as of the time the determination is made**.

*See* ¶72; Release No. 33-6835 (May 18, 1989) [54 FR 22427] (the "1989 Interpretive Release").[17]

As to the first assessment, Defendants cannot plausibly argue that, when Unilever's 2020

Form 20-F Annual Report was filed on March 10, 2021, management had already **objectively**

determined that the relevant events, trends, and uncertainties were "not reasonably likely to occur."

As an initial matter, the B&J Board's decision **was made** in June 2020 and the intercorporate dispute

**had been ongoing** for nine months when the Form 20-F was filed.  Further, Defendants repeatedly

argue in their motion that the ultimate outcome was "uncertain" and "unknown" at the time.  MTD at

---

[17]    Defendants' citation to decisions that do not address the two-part test found in the SEC's 1989 Interpretive Release are accordingly distinguishable.  *See, e.g.*, *Gutman v. Lizhi Inc.*, 2022 WL 4646471, at *4-*5 (E.D.N.Y. Oct. 1, 2022); *Greco v. Qudian Inc.*, 2022 WL 4226022, at *27-*28 (S.D.N.Y. Sept. 13, 2022); *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *6-*8 (E.D.N.Y. Mar. 31, 2021).

15.[18] Given the Resolution's presumptive validity and the purported uncertainty, Defendants could not have **objectively** determined **at the time** that the events, trends, and uncertainties were "not reasonably likely to occur," thus necessitating the second assessment.

As to the second assessment, management was to assume that the events, trends, and uncertainties came to fruition and **objectively** evaluate the consequences, providing sufficient disclosures unless management determined that a material effect on the company's financial condition or results of operations was "not reasonably likely to occur."  Assuming the Resolution was operationalized and the intercorporate dispute became public, causing a customer backlash, lost sales, lost government contracts, divestments by U.S. pension funds, Israeli enforcement actions, and harm to Unilever's reputation among customers and potential acquisition targets, it is easily inferred that Unilever and its Ice Cream business group (¶24) would have experienced a material adverse effect to their financial condition and results of operations.  *See also* Section I.A.4, *infra*.  Unilever's decision a year after the Class Period to "nullif[y]" the Resolution (MTD at 2) by settling the lawsuit filed by B&J's Israeli distributor (¶97) further corroborates the magnitude of the economic consequences to Unilever.  Unilever preferred facing a lawsuit from the B&J Board (¶98) to bearing the full brunt of the Resolution.

Appropriate disclosure concerning the financial impact of the issues was therefore required under Item 303 of Regulation S-K and thus Item 5 of Form 20-F.  *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) (disclosure required because the defendant "could be implicated in the fraud" and the defendant had "possible exposure to significant civil and even criminal liability"); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017) (disclosure required where defendants were aware that their website's violations of Chinese counterfeit

---

[18]         *See also* MTD at 1-3, 7, 9, 14-15, 18 (arguing the intercorporate dispute was an ongoing "debate"); *id.* at 3, 13 n.7, 14 (arguing the Resolution was an "inchoate polic[y]").

regulations exposed them to loss of revenue or threat of civil fines and liability); *Jianpu Tech.*, 2020 WL 5757628, at \*8-\*10.[19]

### 4.    Defendants' Omissions Were Omissions of Material Fact

For purposes of a Section 10(b) claim, a fact is deemed material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010). "Materiality is an 'inherently fact-specific finding' that 'generally should be presented to a jury.'" *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2021 WL 3727095, at \*5 (S.D.N.Y. Aug. 23, 2021); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). "Because materiality is a mixed question of law and fact, a claim may not be dismissed on this ground unless the misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at \*4 (S.D.N.Y. Mar. 20, 2018).

Defendants argue that the Resolution, the intercorporate dispute, and the attendant risks and uncertainties are contingent events whose materiality should be evaluated by balancing both the indicated probability that the event will occur and the anticipated magnitude of the event in light of total company activity. MTD at 19. As for the intercorporate dispute, there was nothing contingent about it. A full-fledged dispute existed. Accordingly, a straightforward analysis of the importance of the dispute to investors suffices under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *See Cooperman v. Individual Inc.*, 171 F.3d 43, 49 (1st Cir. 1999) (finding the existence of a board-level dispute regarding the future direction of a corporation was material to reasonable investors).

---

[19]    *Steamfitters' Industry Pension Fund v. Endo International PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) is inapposite as the omissions involved an "***internal*** business ***strateg[y]***" not a final corporate decision that was specifically designed to be made public and touted for social activism purposes, as was the case with the B&J Board Resolution.

Similarly, the Resolution was the final decision of the B&J Board and should be evaluated as a non-contingent event.  To the extent Defendants rely on any contingency they created via their obstruction, the probability of the Resolution ultimately being "operationalized" was exceedingly high given that it was ultimately operationalized and Unilever itself recognized that the Resolution was within the B&J Board's Social Mission mandate, *see supra* n.9.

Assuming *arguendo* that the risks and uncertainties created by the Resolution and the dispute are to be analyzed as contingent events, it was highly probable that negative consequences would arise once the decision was made public, as confirmed both by Defendants' obstruction and what ultimately happened.  *See, e.g.*, ¶¶9, 89, 93-94, 102-104 (widespread negative publicity and harm to Unilever's reputation); ¶¶7, 9, 47, 90, 95 (divestments by state pension funds under Anti-BDS Legislation); ¶51 (statements that Unilever violated Israeli antitrust law); ¶¶47, 88, 91 (Unilever stock price declines); ¶104 (analyst concluding Unilever's ability to acquire startups harmed).

As for the anticipated magnitude of such events, and materiality more generally, the Second Circuit has "consistently rejected a formulaic approach to assessing . . . materiality," holding that both quantitative and qualitative factors should be considered in an integrative manner, taking into account "all relevant considerations."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) ("*comScore*") ("sufficiently strong qualitative evidence of materiality can establish materiality as a matter of law").  For instance, the Second Circuit has recognized SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999) as persuasive authority, providing a non-exhaustive list of qualitative factors.  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (acknowledging that SAB No. 99 recognizes qualitative factors such as "concealment of an unlawful transaction").

Given the controversial geopolitical issues involved, B&J's status as one of Unilever's marquee brands and most successful acquisitions (¶31),[20] the Resolution's violation of Anti-BDS Legislation prohibiting most U.S. states from doing business with or investing in companies who boycott Israel,[21] and the enormous potential for political, economic, and legal blowback both in Israel and the U.S., investors would reasonably consider the omitted information "important in deciding whether to buy or sell shares." *Operating Loc. 649 Annuity Tr. Fund*, 595 F.3d at 92-93. Indeed, with so many states having enacted Anti-BDS Legislation requiring divestment from companies who boycott Israel (¶¶47, 95), it is difficult to see how the Court could determine *as a matter of law* that reasonable investors would not also find the information significant to their investment decisions.

Professional securities analysts have also weighed in. As one noted, specifically citing B&J's July 2021 announcement, "This year has proven to be relatively damaging from a communications perspective. . . . Rightly or wrongly, this move served to give some investors the impression that Unilever was putting what some perceive as being an increasingly woke agenda ahead of its commercial interests[.]" ¶103. Another concluded that Unilever's dispute with B&J could harm Unilever's turnaround attempt: "Unilever's ability to acquire creative, alternative, forward-thinking, on-the-edge companies is *probably materially impacted by this*." ¶104. *See In re*

---

[20]    Statements or omissions concerning a particularly important product or segment of a business also support a finding of materiality. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 488 (2d Cir. 2011) ("[S]uch a product or segment might be the company's original niche, its iconic or eponymous business, critical to its reputation, or most promising for growth or as an engine of revenue."); *Litwin*, 634 F.3d at 720 (statements material where equity group was "its flagship segment, playing a significant role in the company's history, operations, and value"); ¶24 (Ice Cream is one of Company's five business segments); ¶31 (B&J sales figures).

[21]    Statements or omissions that implicate regulatory compliance or the loss of contractual revenue further support a finding of materiality. *See, e.g.*, SAB No. 99, 64 Fed. Reg. 45150, 45152 (1999); *SAIC*, 818 F.3d at 96 (omission material where it exposed defendant to civil liability and presented the risk of loss of contract revenue and possible exclusion from future contracts with states and municipalities across the United States); *comScore*, 268 F. Supp. 3d at 549 (statements material where they "plausibly affected" regulatory compliance). Here, the undisclosed Resolution triggered a web of Anti-BDS Legislation, putting Unilever at risk of divestment by state pension funds and the inability to do business with state entities. ¶¶90, 95.

*Ply Gem Holdings, Inc.*, 2016 WL 5339541, at *4 (S.D.N.Y. Sept. 23, 2016) (allegation of analyst disappointment resulting directly from alleged omissions supported inference of materiality); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (alleged reactions of securities analysts supported inference of materiality).

Analyzed as a whole and making all reasonable inferences in Plaintiffs' favor, Unilever's omissions were not "so obviously unimportant to a reasonable investor" that dismissal is warranted. *Cohen*, 2018 WL 1406619, at *4.

### B.    PLAINTIFFS PLEAD A STRONG INFERENCE OF DEFENDANTS' SCIENTER

"To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *4 (S.D.N.Y. Sept. 13, 2022). A complaint "pleads sufficient circumstantial evidence of recklessness or conscious misbehavior" when it "plausibly alleges" the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Id.* at *7. "The sufficiency of a complaint's allegations of scienter are evaluated holistically considering all of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation." *Id.* at *4. The inference of scienter need only be "cogent" to a "reasonable person" and "*at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (original emphasis).

That Defendants knew facts or had access to information regarding the Resolution and the ensuing dispute is not in doubt. B&J is a wholly-owned subsidiary of Unilever and Defendants thus had access to the Resolution. ¶¶6, 105. Moreover, Unilever hand-picked McCarthy for the CEO and board-member positions at B&J specifically to represent Unilever's interests and report back to the

Company.  *Id.*  In fact, Unilever conducted the dispute via McCarthy, who prevented the Resolution from being immediately effectuated.  ¶¶8, 40.

Nor is there any doubt about Defendants' ***actual knowledge*** of the Resolution and the dispute.  Plaintiffs allege that, although the B&J Board passed the Resolution in July 2020 (¶4), McCarthy stalled its implementation on Unilever's behalf for a full year, until July 2021.  ¶6.  In the words of Matt Close, Unilever's Business Group President of Ice Cream (¶34 & n.5): "Unilever, Conopco, Ben & Jerry's CEO and the [B&J] Board continued to debate whether and how to implement the Board's desired changes to the company's long-established operations in Israel and the Territories."  ¶107.  As Close went on to say: "Unilever's goal was to find an outcome that ***mitigated the risks to Unilever*** while also respecting the Board's new position regarding business in Israel and the Territories."  ¶41.  Thus, during the year after the Resolution was adopted, Unilever was aware not only of the B&J Board's Resolution, but that the Resolution ***posed "risks" for Unilever's corporate interests***—risks that the Company was eager to delay, conceal, and mitigate.

And, given the controversial nature of the geopolitical issues involved, B&J's status as one of Unilever's marquee brands, the web of state laws prohibiting most U.S. states from doing business with or investing in companies that boycott Israel, and the enormous potential for political, economic, and legal repercussions both in Israel and the U.S., there can be no doubt that the Individual Defendants themselves, given their roles at Unilever, were aware of the Resolution, the dispute, and the risks and uncertainties presented.  Indeed, the week Unilever and B&J disclosed the B&J Board's decision, Jope acknowledged that "[***w]e were aware of this decision*** by the brand and its independent board," and that it had been a "***longstanding issue for Ben & Jerry's***."  ¶107 & n.36.  So great was that sensitivity that both Unilever's and B&J's press releases announcing the Resolution attempted to blunt its impact by representing the Company would continue to do business

in Israel (¶¶42-43)—a representation that Anuradha Mittal, the Chair of the B&J Board, characterized as "***deceit***."  ¶45.

Moreover, Unilever's 2019 and 2020 Forms 20-F acknowledge that "Our approach to risk management is designed to provide reasonable . . . assurance that . . . all information that ***may*** be required to be disclosed is reported to Unilever's senior management ***including, where appropriate, the Chief Executive Officer and Chief Financial Officer***."  ¶108; *see also* ¶63 (alleging all Individual Defendants signed Unilever's 2020 Form 20-F Annual Report); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018) (Schofield, J.) (scienter imputed where officers "not only had access to the facts underlying the [c]ompany's financial reporting, they were responsible for it and attested to its accuracy by signing or certifying the [c]ompany's Forms 10-K and 10-Q").  If there was any risk management situation that was "appropriate" for disclosure to Unilever's CEO and CFO, this was it.  And it is impossible to credit any suggestion that Sotamaa, Unilever's Chief Legal Officer and the person who signed all of the filings at issue, would not be aware of the Resolution and the dispute, given the enormous potential impact of Anti-BDS Legislation and Israeli law not only on B&J, but on Unilever.  *See also IMG Mem'l Fund 1, LLC v. First Landing Fund, LLC*, 2022 WL 826276, at *5 (S.D.N.Y. Mar. 18, 2022) (Schofield, J.) ("Because the statements relate to Vantage and First Landing's own conduct, they knew or should have known that their statements were inaccurate.").

Defendants try to downplay their year-long knowledge of the Resolution, the dispute, and the attendant risks and uncertainties by casting everything as a mere subject of debate—a matter of evolving corporate strategy that need not have been disclosed.  *See, e.g.*, MTD at 2, 14-15.  While Defendants succeeded in delaying the implementation of the Resolution, at the time they believed they had no right to block it.  *See supra* n.9.  Shortly after announcing the Resolution in July 2021,

- 23 -

Unilever issued a statement admitting: "As part of the acquisition agreement, **we have always recognized the right of the brand and its independent Board to take decisions about its social mission**." ¶43. Instead, they concealed the Resolution and the dispute for almost a year after their obligation to disclose it arose. This act of concealment is itself probative of scienter. *See, e.g.*, *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (efforts to "conceal the true facts" support a strong inference of scienter).

Similarly, Defendants contend that there can be no scienter where the duty to disclose is "unclear." MTD at 4, 23. But as the Second Circuit just reaffirmed in *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767 (2d Cir. Dec. 20, 2022), "a duty [to disclose] may arise when there is . . . a statute or regulation requiring disclosure, . . . , such as Items 303 and 503 of SEC Regulation S-K.[22] Second, [e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* at *1. As discussed above, *see* §I.A, Defendants had a crystal-clear duty of disclosure.

Thus, this case is very different from *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), where the court found that "the duty to disclose the Hostetter letter was not so clear, especially given that the public was aware that MediaOne could accept a superior proposal within forty-five days." *Id.* at 143. Here, the public had no inkling whatsoever of the Resolution and dispute, and there were multiple bases requiring disclosure. Similarly, in *In re Seadrill Limited Securities Litigation*, 2016 WL 3461311 (S.D.N.Y. June 20, 2016) (Schofield, J.), the Court wrote that the "uncertainties about the sanctions [at issue] were disclosed . . . , thus 'undercut[ting] the inference that [Defendants were] attempting to conceal the truth.'" *Id.* at *12. Here, by contrast, although Unilever disclosed some

---

[22]    This decision reversed *City of Riviera Beach General Employees Retirement System v. Macquarie Infrastructure Corp.*, 2021 WL 4084572 (S.D.N.Y. Sept. 7, 2021), a decision Defendants cited in support of their Item 303 argument. *See* MTD at 18.

abstract risks, it failed to disclose the known, already-existing facts of the B&J Board's Resolution and the ensuing dispute, with their serious, inevitable repercussions for the Company, which Defendants withheld from investors a full year. So while there may not have been an inference of concealment in *Seadrill*, there was actual, intended concealment here.

Finally, the inference that Plaintiffs offer is cogent and ***at least*** as compelling as Defendants' opposing, nonfraudulent inference. Although, as discussed above, Defendants characterize their own conduct as mere participation in an internal corporate debate (MTD at 23-24), that explanation rings hollow. Because Unilever believed the B&J Board had the right to pass the Resolution, the so-called "debate" served only to postpone the inevitable. The far more plausible explanation is that Defendants, fully appreciating the momentous consequences of the Resolution for both B&J and Unilever, sought to delay and conceal those consequences for as long as they possibly could.

## II.    PLAINTIFFS STATE A SECTION 20(a) CLAIM

Because Plaintiffs plead primary liability against the Defendants under §10(b) of the Exchange Act, including by adequately pleading the Individual Defendants' scienter (and thus culpable participation), Plaintiffs state a claim against each Defendant under §20(a).

## CONCLUSION

Plaintiffs respectfully request that Defendants' motion be denied. Should the Court nonetheless find the AC deficient in any respect, Plaintiffs request leave to amend. *See Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) (on proper timing).

DATED: January 24, 2023        ROBBINS GELLER RUDMAN
                                  & DOWD LLP
                                  SAMUEL H. RUDMAN

                                  */s/ Samuel H. Rudman*
                                  SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
rgonnello@rgrdlaw.com

*Attorneys for Plaintiffs*

- 26 -