UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                               :

CITY OF ST. CLAIR SHORES POLICE AND   :
FIRE RETIREMENT SYSTEM, et al.,        :

                    Plaintiffs, :        22 Civ. 5011 (LGS)
                               :

           -against-         :      **OPINION AND ORDER**
                               :

UNILEVER PLC, et al.,            :

                    Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

       Lead Plaintiff Teamsters Local 456 Annuity Fund and Plaintiff City of St. Clair Shores Police and Fire Retirement System, individually and on behalf of all other persons similarly situated, bring this putative class action against Defendants Unilever PLC ("Unilever"), Alan Jope, Ritva Sotamaa and Graeme Pitkethly, alleging violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). Defendants move to dismiss the Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted.

I.      **BACKGROUND**

       The following facts are taken from the Complaint or are matters of which judicial notice may be taken, including public filings. *See Dixon v. von Blanckensee*, 994 F.3d 95, 101-02 (2d Cir. 2021); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 69 n.2 (2d Cir. 2010) (public filings).

A.      **Ben & Jerry's and Its Board Resolution**

Defendant Unilever is a London-based, multinational consumer products company whose American Depository Receipts ("ADRs") are publicly traded on the New York Stock Exchange. Defendants Alan Jope, Ritva Sotamaa and Graeme Pitkethly (collectively, "Individual Defendants") were officers of Unilever throughout the relevant period.  Defendant Jope was Unilever's Chief Executive Officer and a member of its Board of Directors.  Defendant Sotamaa served as Unilever's Chief Legal Officer and Group Secretary.  Defendant Pitkethly was Unilever's Chief Financial Officer and a member of its Board of Directors.

In 2000, Unilever, through its wholly owned corporate subsidiary, Conopco, Inc. ("Conopco"), acquired U.S. ice cream maker Ben & Jerry's Homemade, Inc. ("Ben & Jerry's"), known for both its ice cream and outspokenness on social issues.  Ben & Jerry's is a wholly owned subsidiary of Conopco.  As part of the acquisition, Ben & Jerry's was allowed to maintain an independent board of directors (the "B&J Board") for overseeing the company's social mission.  Since 1987, Ben & Jerry's had a licensing agreement with Avi Zinger (the "Zinger Agreement"), an Israeli distributor, granting his companies the exclusive right to manufacture and distribute Ben & Jerry's ice cream throughout Israel and the Israeli-occupied territories.  The Zinger Agreement continued through Ben & Jerry's acquisition by Unilever and was renewed and amended over time, with the operative iteration set to expire December 31, 2022.

Beginning in 2014, the B&J Board began to consider whether the company should continue to sell its ice cream in Israel, in light of the enduring Israeli-Palestinian conflict.  On several occasions from 2018 to 2021, Zinger informed the B&J Board that any directive to cease distribution of Ben & Jerry's products in Israeli-occupied territories would be a violation of Israel's anti-discrimination and anti-boycott laws and would subject Zinger's companies to

criminal liability.  Many U.S. states have also enacted legislation to discourage boycotts of, divestments from, and economic sanctions against Israel, so-called anti-BDS laws.  A company that violates an anti-BDS law can be barred from doing business with the enacting state, and the state may divest its shares in the offending company, thereby driving down the value of the company's stock.  Against this backdrop, in July 2020, the B&J Board decided not to renew the Zinger Agreement when it lapsed in December 2022 and passed a resolution (the "Resolution") to end sales of Ben & Jerry's products in areas the B&J Board considered to be Palestinian territories, illegally occupied by Israel.

The Resolution was not immediately announced or implemented.  The Ben & Jerry's CEO, a Unilever appointee, determined not to implement the resolution immediately, thus thwarting the B&J Board's decision.  According to Matt Close, Unilever's Business Group President of Ice Cream, whose sworn statement is quoted in the Complaint, for a year following the Resolution's passage, Unilever, the B&J Board and Matthew McCarthy, Ben & Jerry's CEO, debated "***whether*** and how to implement the [B&J] Board's desired changes."  (Emphasis in Complaint.)  Unilever disagreed with the Resolution and aimed to "***find an outcome that mitigated the risks to Unilever*** while also respecting the [B&J] Board's new position regarding business in Israel and the Territories."  (Emphasis in Complaint.)  "In other words, Unilever disagreed with the B&J Board's decision but chose to delay implementation for as long as possible."

### B.    Alleged Misstatements and Omissions

The Complaint alleges that Defendants made materially false and misleading statements through omissions in public risk-disclosure filings between September 2, 2020, and July 21, 2021, inclusive (the "Class Period"), when Unilever knew of the July 2020 Resolution but before

any announcement of a change in the Company's plans to sell Ben & Jerry's in Israel and the occupied territories.  In essence, Defendants' failure to disclose the Resolution in its public filings during the Class Period allegedly misled investors about customer, ethical and legal risks Unilever faced.

Before the B&J Board passed the Resolution, on March 9, 2020, the Company filed its 2019 annual report on SEC Form 20-F ("March 2020 Form 20-F").  The March 2020 Form 20-F stated that Unilever planned to "maintain[] strong relationships with [Unilever's] existing customers," in part by ensuring the Company's brands are "available for purchase at all times."  The March 2020 Form 20-F also stated, "Acting in an ethical manner, consistent with the expectations of customers, consumers and other stakeholders, is essential for the protection of the reputation of Unilever and its brands."  The March 2020 Form 20-F also said, "Compliance with laws and regulations is an essential part of Unilever's business operations."

Plaintiffs allege that Unilever's subsequent SEC filings between September 2020 and July 2021 were materially misleading because they followed the adoption of the Resolution, but either repeated or referenced the March 2020 risk disclosure without disclosing the Resolution or its attendant risks.  Each of these filings was signed by Sotamaa and included one or more unspecified quoted statements by Jope, except as noted, and are as follows:

- September 2, 2020, Form 6-K,

- October 22, 2020, Form 6-K,

- February 4, 2021, Form 6-K,

- March 10, 2021, Form 20-F Annual Report for 2020, which did not contain a statement by Jope, but whose Strategic Report had been approved by the Board, including Jope and Pitkethly,

- March 10, 2021, Form 6-K, which did not contain a statement by Jope and

- April 29, 2021, Form 6-K.

C.      **Public Announcement**

A year after the Resolution's passage, the B&J Board decided to announce its decision publicly.  Disagreement persisted among Unilever, Ben & Jerry's and the B&J Board over the Resolution.  On July 19, 2021, Ben & Jerry's announced through its website and Twitter account that, upon expiration of the Zinger Agreement, Ben & Jerry's would cease distribution in Israeli-occupied territories but would continue sales in Israel.  "[W]e will stay in Israel under a different arrangement."  (Emphasis omitted.)  Unilever issued its own statement, reaffirming that Ben & Jerry's would continue sales in Israel.  Per news coverage by NBC, the B&J Board disagreed with Unilever and Ben & Jerry's that Ben & Jerry's would continue sales in Israel.

In response to the news, the price of Unilever ADRs closed down $0.58 per ADR on July 19, 2021 (approximately 1%) and down $0.75 per ADR on July 20, 2021 (approximately 1.3%).  On July 22, 2021, after news of negative reactions by the Israeli Prime Minister and the states of Texas and Florida to the apparent Ben & Jerry's Israeli boycott, the price of Unilever ADRs closed down $3.19, approximately 5.4%.

The matter was resolved in June 2022, when Unilever sold its Ben & Jerry's business interests in Israel to Zinger, its local licensee, with Ben & Jerry's to be sold under its Hebrew and Arabic names.  The Unilever announcement (as quoted in the Complaint) noted, among other things: "Under the terms of Unilever's acquisition agreement of Ben & Jerry's in 2000, Ben & Jerry's and its independent Board were granted rights to take decisions about its social mission, but Unilever reserved primary responsibility for financial and operational decisions and therefore has the right to enter this arrangement."

## II.      STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, a complaint's "factual allegations must be enough to raise a right to relief above the speculative level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022).[1]  On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016); *accord Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021).  However, a court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon*, 994 F.3d at 101.

## III.     DISCUSSION

Plaintiffs assert a claim of securities fraud under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5.  That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Plaintiffs also assert a claim of control person liability under § 20(a) of the

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

Exchange Act.  As explained below, both claims are dismissed because the Complaint insufficiently pleads that Defendants had the requisite scienter to be liable for securities fraud.

### A.      Section 10(b) Claim

#### 1.   Section 10(b) Elements and Pleading Requirements

To support a claim for securities fraud, "a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022).  "The first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil Procedure 9(b)." *Id.* at 102-03.

Regarding the element of scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "This standard requires courts to take into account plausible opposing inferences." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *accord Denny v. Canaan Inc.*, No. 21 Civ. 3299, 2023 WL 2647855, at *4 (S.D.N.Y. Mar. 27, 2023).  "For an inference of scienter to be strong . . . a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).  "In making this determination, the court must review all the allegations holistically." *Siracusano*, 563 U.S. at 48.

A plaintiff may satisfy the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare*

*Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior or recklessness by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Set Cap. LLC*, 996 F.3d at 83 n.73. "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *accord Denny*, 2023 WL 2647855, at *12. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *accord Denny*, 2023 WL 2647855, at *13.

A complaint may satisfy the scienter requirement as to a corporation "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015); *accord UA Loc. 13 Pension Fund v. Sealed Air Corp.*, No. 19 Civ. 10161, 2021 WL 2209921, at *7 (S.D.N.Y. June 1, 2021). Courts will then "look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). "Under this approach, the most straightforward way to raise a

strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." *Id.*

### a.  Individual Defendants

The Complaint does not sufficiently plead scienter for any of the Individual Defendants. The Complaint does not allege motive but attempts to plead "strong circumstantial evidence of conscious misbehavior or recklessness." *See Setzer*, 968 F.3d at 212.  The Complaint's scienter allegations focus on the Individual Defendants' knowledge of the Resolution, their duty and ability to disclose it and their deliberate delayed disclosure.

Accepting as true Plaintiffs' contention that the Individual Defendants had "actual knowledge of the Resolution," this alone cannot support an inference that they "knew facts or had access to information suggesting that their public statements were not accurate." *See Blanford*, 794 F.3d at 306.  Plaintiffs' scienter argument rests on the assumption that implementation of the B&J Board's Resolution was a certainty or at least probable, and known by the Individual Defendants to be so, in the year between the Resolution's adoption and its announcement.  This assumption is belied by the Complaint.

First, the Complaint makes clear that the B&J Board lacked operational control to implement the Resolution.  Ben & Jerry's was a wholly owned subsidiary of Unilever.  The B&J Board had limited responsibility "for overseeing [Ben & Jerry's] Social Mission," but Unilever "had primary responsibility for financial and operational decisions."  Although the Resolution apparently was within the ambit of the board's authority, the B&J Board had no power to implement its own resolution.  Ben & Jerry's CEO, appointed by Unilever, "chose not to

'operationalize' the resolution immediately, thus temporarily thwarting the B&J Board's

decision." Although the Complaint asserts that the CEO belatedly implemented the Resolution

on July 19, 2021, the Complaint shows that characterization to be false. On July 19, the day of

the supposed implementation, Ben & Jerry's and Unilever on the one hand, and the B&J Board

on the other hand, made conflicting announcements about Ben & Jerry's intention to sell in

Israel. The B&J Board apparently wanted to boycott Israel, and Unilever apparently did not.

The Complaint details how the dispute ultimately was resolved. A year later, Unilever exercised

its operational control to sell the entire Ben & Jerry's Israeli business to its company's former

Israeli licensee, over the protests of the B&J Board, which sought unsuccessfully to enjoin the

sale. Unilever had retained operational control over its wholly owned subsidiary, a fact that

Defendants presumably knew. They had no reason to believe that the Resolution would be

adopted or implemented in a way that was contrary to Unilever's wishes and accordingly did not

act with scienter in delaying disclosure of the Resolution.

Second, according to the Complaint, during the year of alleged non-disclosure, whether

and how the Resolution would ever be implemented was uncertain. Following adoption of the

Resolution, Unilever and the B&J Board "continued to debate ***whether*** and how to implement

the [B&J] Board's desired changes." Unilever sought to "find an outcome that mitigated the

risks to Unilever while also respecting the Board's new position regarding business in Israel and

the Territories." (Emphasis in Complaint.) From this, Plaintiffs conclude that the delayed

announcement was an act of concealment reflecting Defendants' knowledge of "the negative

consequences that a truthful announcement would have had." But the Complaint describes a

reality in which Defendants did not yet know what the ultimate outcome would be. In either

case, the Complaint offers no foothold for the conclusion that Defendants knew during the Class

Period that the B&J Board's expression of its wishes in the Resolution was contrary to Unilever's public risk disclosure statements.

"[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information." *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 735 (S.D.N.Y. 2018). Unless and until Defendants understood that the Resolution would be implemented, Defendants cannot have acted with the requisite scienter in not disclosing a possible change in business strategy and accompanying risks. To the contrary, as described in the Complaint, the Resolution was never adopted and its proposal was avoided by selling the Israeli Ben & Jerry's business. In other words, the Resolution was never implemented as envisioned by the B&J Board. Ben and Jerry's, the Unilever subsidiary whose social mission the B&J Board guided, would not sell to Israel, but Ben & Jerry's ice cream would be sold in Israel and the occupied territories, under its Hebrew and Arabic names, by an independent entity. The most cogent inference from the allegations is that Unilever delayed announcement of the Resolution to determine what, if anything, to do about it. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (holding that plaintiffs did not adequately plead scienter where "the most cogent inference from [the] allegations, in tandem with assertions about [defendant's] internal deliberations, is that [the company] delayed releasing information on its Form 10-Qs in the second and third quarters of 2007 to carefully review all of the relevant evidence and was at worst negligent as to the effect of the delay on investors"); *accord In re Seadrill Ltd. Sec. Litig.*, 14 Civ. 9642, 2016 WL 3461311, at *13 (S.D.N.Y. June 20, 2016) ("Despite Plaintiffs' arguments, the more compelling inference is that Defendants were reacting to an uncertain and

rapidly changing environment and attempting to understand the implications of each successive set of sanctions."). [2]

Plaintiffs' arguments to the contrary are unconvincing.  Plaintiffs contend that Defendants must have recognized the inevitability of the Resolution's enactment because "at the time [of its adoption] they believed they had no right to block it."  But that statement is undermined by Close's sworn statement, which the Complaint references repeatedly, that for the year following the B&J Board's adoption of the Resolution, Unilever and the B&J Board debated "*whether* and how to implement the Board's desired changes."

Plaintiffs next point to Second Circuit precedent, *Blanford*, 794 F.3d at 308, for the proposition that "the act of concealment is itself probative of scienter."  But that proposition is based on facts readily distinguished from those in the Complaint.  In *Blanford*, Green Mountain Coffee Roasters, Inc. ("Green Mountain") and several individual defendants were alleged to have made affirmative misstatements about the size of Green Mountain's inventory.  Defendants repeatedly told investors that Green Mountain was struggling to meet the high demand for its coffee and had no excess inventory.  *Id.* at 306.  In rebuttal to this narrative, the complaint detailed numerous observations by confidential witnesses ("CWs"), all former employees of Green Mountain, who described a massive overstock of inventory such that Green Mountain had to dispose of "pallet after pallet after pallet as the coffee products expired."  *Id.* at 307.  One CW described Green Mountain's practice of temporarily loading inventory onto trucks and carrying it

---

[2] The 10b-5 claim is dismissed for the independent and alternative reason that Defendants had no duty to disclose the Resolution.  Particularly where the challenged risk disclosures were general in nature and made no affirmative statements about sales in Israel, the Company had no duty to disclose a potential course of action or business plan that was still subject to debate.  "[W]here an outcome is merely speculative, the duty to disclose does not attach."  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (collecting cases).

away before an audit, only to return that inventory to the warehouse after the audit's completion. *Id.* Another CW corroborated that story. *Id.* The Second Circuit held that this circumstantial evidence of efforts to "conceal the true facts" supported a strong inference of scienter. *Id.* at 308. Here, the Complaint does not plead any comparable facts suggesting a conscious effort to conceal information that might hurt Unilever's stock price. The Complaint does not even plead facts to suggest that Defendants thought it likely that the Resolution would be implemented with the possible negative consequences to follow.

### b.  Defendant Unilever

The Complaint does not sufficiently plead that Unilever as a corporation acted with scienter, as no Individual Defendant acted with the requisite scienter. *See Loreley Fin. (Jersey) No. 3*, 797 F.3d at 177.

### B.      Section 20(a) Violation

Section 20(a) imposes joint and several liability on control persons for underlying violations of the Exchange Act. *See* 15 U.S.C. § 78t. To state a claim under § 20(a), a plaintiff must allege both a primary violation of the Exchange Act and control over the primary violator. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Because the primary claim fails, the § 20(a) claim is dismissed as well.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Defendants' letter motion for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to close the motions at Dkts. 30 and 37.

Dated: August 29, 2023
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

13